(No. 6504.   July 26, 1938.)

VICTOR E. ARNESON, Respondent, v. F. D. ROBINSON and NORTHWEST INDEMNITY EXCHANGE, Appellants.

[82 Pac. (2d) 249.]

Spencer Nelson and Ralph S. Nelson, for Appellants.

226

Allen H. Asher, for Respondent.

GIVENS, J.—Respondent was employed as a hooker in connection with skidding logs for appellant Robinson whose insurance carrier is the other appellant. September 3, 1936, a skidded log caught and suddenly released a small tree

which, springing back, struck respondent just below the knee, causing instant severe pain, but not compelling him to discontinue work until 10 days thereafter.

Respondent is corroborated as to the happening of the accident by George Varner, running the jammer, who testified he was sitting on the jammer about 75 feet from respondent:

"A. He (respondent) went out in the woods and was pulling the cable and hooked on to a log and we was pulling it in with the jammer and this limb caught and hit him on the knee.

"Mr. NELSON: On the knee or below the knee?

"A. In the region of the knee.

"Q. What did Arneson do immediately after he was hit?

"A. Sat down and held on to his leg.

"Q. Then what did he do?

"A. Then he got up and followed the log in to the decking.

"Q. Up to where you were?

"A. Yes.

"Q. When he was coming up did he show any ill effects from the injury?

"A. He was limping.

"Q. This was noticeable, was it?

"A. Yes."

Respondent did not notify the foreman nor anyone in authority until September 13th, after he had been refused admittance to the hospital operated by appellant's contract physician, when he encountered Arden Davis, timekeeper for appellant company whom he did not tell of the accident, but merely of being refused medical care and attention, and no other notice was given, except a statement to the contract physician, until notice of application for compensation which was more than 60 days after the accident.

Appellants contend lack of timely notice under sec. 43–1202, I. C. A., bars compensation. In passing upon this point it is necessary to consider briefly the main point of the case. Appellants take the position the injury and disability which respondent suffered after being struck by the tree was an

old chronic osteomyelitis from which respondent had recurrently suffered and had been operated on, in no way connected with the snapping tree. Respondent on the other hand claims the injury was caused by being struck by the tree, and had no connection with the osteomyelitis.

Respondent saw Dr. Page, appellant's contract physician, September 11th, and told him of the accident and asked for medical assistance, which Dr. Page refused because he had previously treated respondent for osteomyelitis and considered his injury arose from that and not from any accident which entitled him to any medical attention under the contract. The pertinent testimony of the respondent and Dr. Page is as follows:

ARNESON, respondent:

"Q. I will ask you, Mr. Arneson, whether you ever gave notice to Robinson or any of his employees of this injury?

"Mr. NELSON: We object to anything as to the employees as it is not binding on the defendants.

"Mr. SUPPIGER: Did you give notice to anyone?

"A. We were working about a mile and a half or two miles from camp and I never did get down there. Dr. Page asked me if I had a hospital ticket and I said I could get one from the fellows I was riding with but I never got to see them.

"Q. Did you ever talk to Arden Davis, the bookkeeper about this?

. . . . . . . . . . . . . .

"A. On Sunday I went down to see him about it, when I got refused to go in the hospital.

"Q. On about what date?

"A. The 13th.

"Q. Of September?

"A. Yes.

. . . . . . . . . . . . . .

"A. I told him I tried to get in the hospital up there and was refused and asked him why it was I couldn't get in and he said he didn't know and he would have to go and look it up.

"Q. After receiving this injury, will you tell the Board just what you did with regard to getting it taken care of?

"A. When I couldn't get in the hospital I went up and seen Dr. Neal and he says—

"Q. Who?

"A. Dr. Neal Wendle, rather and he says that he couldn't treat me at home; that it was a hospital case and that if I could make preparations to go to the hospital he would take care of me, which he did.

"Q. Did you see Dr. Page prior to seeing Dr. Wendle?

"A. Yes, I seen Dr. Page first.

"Q. When did you see him first?

"A. The 11th or 12th, I was there two different days.

"Q. Of September?

"A. Yes.

"Q. Did Dr. Page treat you?

"A. No.

"Q. Why not?

"A. When I was up there the first time he told me to get a hospital ticket and I went down to see if I could get one and when I went up the last time he refused to take care of me.

"Q. Then you went to Dr. Wendle?

"A. Yes.

"Q. After seeing Dr. Wendle, did you return to Dr. Page?

"A. No.

"Q. How many times did you see Dr. Page?

"A. Twice.

"Q. He refused to take care of you either time?

"A. Yes.

"Q. About what date were you taken to the hospital?

"A. The 14th.

"Q. Of September?

"A. Yes."

ARNESON, on cross-examination:

"Q. And you went to see the doctor the 11th?

"A. Yes.

"Q. Who was the doctor?

"A. Dr. Page.

"Q. Your leg was bared up above the knee?

"A. Yes.

"Q. And the doctor looked at it?

"A. Yes.

"Q. And he told you it was an old injury, didn't he?

"A. Yes."

Dr. PAGE:

"Q. Do you remember seeing him again September 11, 1936, whenever he came to the hospital?

"A. I don't remember the date. I saw him when he came to the hospital.

"Q. Had his knee been exposed or bared for your examination?

"A. Yes.

"Q. You say you didn't at that time remember having seen him before?

"A. I did not, at the time.

. . . . . . . . . . . . . .

"Q. What condition was this man's left knee in on about September 10 or 11, 1936?

"A. Upon examination he complained of being struck below the knee joint here in front of the tibia. I examined the leg carefully and there was no abrasion and no tenderness and no complaint of pain but the knee was enlarged as if it contained fluid in excess of the normal.

"Q. Synovial fluid?

"A. Yes—names don't come as fast as they used to. There was some enlargement apparently on the inside of the condyle there. I looked it over carefully and he didn't complain of any pain or of being in pain, just said he was struck below the tibia, below the knee. I told him very quickly that that was an old condition there. I could see no connection or any indication of an injury and that it was an old condition. I made a note of the condition at the time. When a man comes in and complains of an injury we make a note of the circumstances and I made a careful notation and ·Miss Jacobson took them down.

"Q. However you told him it was an old condition and he left the hospital?

"A. Yes, and as soon as he had gone Miss Jacobson and Miss Farrar called my attention to the fact he was in the hospital for about a month under Dr. Tyler's care and it was for the same knee.

. . . . . . . . . . . . . . .

"A. The following afternoon or evening he came in and says 'I think I shall stay in the hospital a while.' And I said 'I think you will not. This condition is an old condition and I am under no contract to take care of chronic conditions.'

"Q. You didn't consider this the result of the strike he now testifies to?

"A. No.

"Q. You considered it a diseased condition rather than caused from the trauma?

"A. In the joint—I attributed it to the old condition. I could see no indication of acute inflammation there."

Dr. PAGE, on cross-examination:

"Q. Did you treat him (Arneson) at that time?

"A. I did not. If I had I would have assumed the responsibility.

"Q. Did you take any X-rays?

"A. No. I was satisfied it was a chronic condition even before I got this information.

"Q. Did you take any samples of the knee fluid at that time?

"A. *No, I didn't and I would not have done so anyway.*"

▮ It thus sufficiently affirmatively appears appellants were not injured by the delay of notice of the accident, even though it is conceded the notice to the physician was not notice under the statute, although there is authority it is. (*Vandalia Coal Co. v. Holtz,* 68 Ind. App. 670, 120 N. E. 386, 387; *Johnson v. Caleasieu Sulphate Paper Co.,* 15 La. App. 55, 130 So. 251; *Sloss-Sheffield Steel & Iron Co. v. Foote,* 231 Ala. 275, 164 So. 379; Annotations, 78 A. L. R. 1268; 92 A. L. R. 517.) Respondent's claim is not barred by reason of sec. 43–1205, I. C. A.

Upon respondent's being refused medical attention by Dr. Page he secured the attendance of Dr. Wendle, who described his treatment and condition as follows:

"Q. What was his injury when you examined him?

"A. He had a swollen painful left knee.

"Q. You examined the knee, did you, on those dates?

"A. I did.

"Q. What appeared to be the nature of the injury?

"A. He had a badly swollen inflamed knee that was causing him terrific pain. The knee was red and could not be moved on account of the swelling. There was considerable bulging above the patella, or knee cap and also below. There was also a fluctuation in the prepatellar bursa.

"Mr. NELSON: When was this?

"A. September 14.

"Q. Did Mr. Arneson have pneumonia at that time?

"A. He did not.

"Q. I will ask you from September 14, 1936, up until the present time just what treatment, what kind, you have given Mr. Arneson. You may refer to your records.

"A. On the 12th the family and Mr. Arneson requested that I see him.

"Q. September?

"A. Yes. They told me that Mr. Arneson had a hospital ticket.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. He told me he had a hospital ticket, he was at Page's and I advised him to see Dr. Page and be treated. They called me on the 14th by phone and I told them I couldn't take care of Mr. Arneson, that it was a hospital case and he had no money and for him to go ask the county doctor to care for him. I told him he would need X-rays and a lot of care as he had a bad knee. Dr. Page was the county doctor at that time. Later that night some of the neighbors called me and the family called me and said— ·

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. Different ones in the neighborhood called me and asked me to come down.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. I went down to relieve his pain with a hypo and advised hospitalization. I told them I would not take the case unless it was hospitalized. They moved him that night to the hospital.

"Mr. SUPPIGER: Which hospital?

"A. Graham. There I saw him until the first of November. On the 16th I aspirated the knee and examined part of the fluid and sent part to the laboratory in Spokane. I also X-rayed the knee. At that time there was no other signs of any swelling on the leg, which was normal except for the knee. The other leg was normal.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"A. The fluid I got from his knee was pus and some organisms, and the laboratory report was a pneumococcic infection. He was given regular care at the hospital. He suffered terrific pain and we had to use opiates a large part of the time. The pain was terrific and he required a lot of care. In all I saw him at the hospital thirty-five times and aspirated the knee three times receiving pus each time, which became gradually thicker. There was some abscesses formed or fluctuations in the joint, five of which I opened and put—it continued to drain from these abscesses or sinuses.

"Mr. SUPPIGER: Where were these abscesses?

"A. Above the knee. There was two above, one on each side of the knee cap and three below. He also has an old boil scar on the posterior side of the knee which later opened of itself, of its own accord. On about the middle of October the swelling gradually went down and the pain lessened and he was able at that time—during this time I took more X-rays. In all I have taken seven from time to time, and on the 26th I gave Mr. Arneson—

"Mr. SUPPIGER: 26th of what?

"A. October. I gave him a spinal anesthetic and endeavored to reduce the subluxation of the joint which had been more or less developing, although it was shown to be present in the first X-ray. At that time I endeavored to move the tibia forward on the joint and cast the leg. He left the hospital on the first of November. I saw him at

home first on November 2nd. I have made, up to March 13, I have made 15 home visits. I opened one abscess while he was at home. I have put on to date five plaster casts on this leg. The function of the knee during this process has been destroyed. There was no surgery except for the abscesses and the joint surfaces are gone and we have ankylosis. He still has some draining sinuses and some considerable debris and some small pieces of dead bone coming from these draining sinuses of the knee joint. I have had Dr. Stackhouse see him and go over the X-rays on December 4. I have had my father, Dr. F. G. Wendle see him from time to time and go over the case with me and also see the X-rays.''

■■ Three physicians who did not see respondent at the time of or immediately after the tree hit him, but as experts and from their previous treatment of him for osteomyelitis, testified that in their opinion his illness following the accident was the result of the osteomyelitis and not the accident. Aside from the above conflict there is evidence that the knee fluid showed pneumococcic infection and that such is not a very common infection for osteomyelitis or a joint; thus the testimony in support of the board's ruling is positive and affirmative, entitled to more weight than the *contra* negative testimony. (*Bever v. Morrison-Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605.)

''Dr. WENDLE:

''A. The fluid I got from his knee was pus and some organisms, and the laboratory report was a pneumococcic infection. . . . .

. . . . . . . . . . . . . .

''Q. What is your interpretation of that condition as shown by this exhibit (X-ray taken September 16, 1936)?

''A. This shows a good deal of soft tissue but no bone destruction according to my interpretation. It also shows a depression of the furuncle, the old boil which he had. The bones are essentially the same as those of the other leg. This is the left leg. At that time there was no bony destruction, just the swelling at and above the knee. There is some swelling in the joint itself and some evidence of fluid.

. . . . . . . . . . . . . .

"A. The diagnosis is acute suppurative traumatic arthritis of the left knee. Its organism I believe is pneumococcus. I believe the cause was a trauma which Mr. Arneson said he received September 3rd, and that is entirely possible.

"Q. Is it possible that this condition was brought about by a trauma or a blow?

"A. Yes, I have every reason to believe it was.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Doctor, I will ask you what the reason was why you thought Arneson had what you call suppurative arthritis rather than chronic osteomyelitis?

"A. Osteomyelitis is an infection of the bone marrow. The bone marrow is not infected and never has been infected according to my interpretation of the X-rays. The infection started in the joint. There was pus and organisms in the joint. There was a period of approximately three weeks before any bone involvement showed in these X-rays and then the bone became infected from an extension of the joint. The inflammation extended further and further into the cortex of the bone. Osteomyelitis usually occurs in the young. This man is 25 years of age the first time any indication of osteomyelitis started. Pneumococcus isn't a very common infection for either osteomyelitis or a joint. It does sometimes cause this condition without any preceding pneumonia germs which settle in any injured spot and set up an infection, and that is what happened there.

"Q. This boil or sinus that you found there could have been the source of the infection?

"A. No.

"Q. Why not?

"A. Furuncles or boils are due to staphylococcus and this was pneumococcus. I have never heard of a pneumococcic boil. This was a boil."

"Dr. HUSTED:

"A. Osteomyelitis is an inflammation of bone. It can be either acute or chronic and can be due to many different causes, different infections.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"A. The most common kind seen in industrial cases is caused from staphylococcus aureus or albus, hemorrhagic

type usually, or blood type. The source is usually from the skin. In traumatic wounds infection gets in through the skin into the bone from an outside source. Most of our industrial cases are patients well past youth, adults and are past the age when acute hemorrhagic osteomyelitis develops. In most cases that I have had, they have had that during childhood and that has flared up after they became fully matured.

"Q. Basing your opinion on the testimony and X-rays in this case, what in your opinion would this blow below the knee on the shin have to do with the development of this man's disability, if it did occur?

"A. I believe this blow which occurred below the knee, and if there was such a blow, and the disease developed in the femur, was a different thing entirely.

. . . . . . . . . . . . . .

"A. An osteomyelitis of the hemorrhagic type is very apt to originate in the marrow but it may originate in any part of the bone. It may be a panosteitis and involve any part of the bone, the periosteum, cortex or marrow.

. . . . . . . . . . . . .

"A. We feel that the type of trauma has a great deal to do with the traumatic arthritis. My experience has taught me that trauma must be sufficient to cause a man immediately to be so disabled he can't continue his work. That is one of the postulates I would set down. My experience leads me to believe that.

"Q. Can trauma bring on an arthritic condition?

"A. There is a great deal of controversy on that."

. . . . . . . . . . . .

"Dr. TYLER, examined Arneson February 1933:

"Q. Do you remember what caused his disability at that time?

"A. I remember my diagnosis.

"Q. What was it?

"A. My diagnosis at that time was an arthritis.

"Q. Was it rheumatoid arthritis?

"A. I told him it was a rheumatoid arthritis. I wasn't sure what the infection was but I knew there was an infection there."

As asserted by appellant it was error for the commissioner to permit Dr. Wendle to answer this question:

"You stated before you consulted with Dr. F. G. Wendle and Dr. Stackhouse about this case. What did they have to say relative to the case?"

because it was hearsay, but it does not require a reversal because there is other sufficient evidence to support the findings. (*Butler v. Anaconda Copper Min. Co.,* 46 Ida. 326, 331, 268 Pac. 6; *Wilson v. Standard Oil Co.,* 47 Ida. 208, 210, 273 Pac. 758.) In *Jensen v. Wheeler & England,* 51 Ida. 91, 1 Pac. (2d) 624, there was no *other* competent evidence upon which to base the award.

Appellants ask this court to remand the case to the board because of newly discovered evidence and for fraud of claimant in withholding from the board and from doctors who examined him that he had been treated and examined by a Dr. Stauffer who had previously diagnosed his former ailment as osteomyelitis, the affidavit of appellants' attorney reciting as follows:

" . . . . Said fraud, was brought to affiant's attention particularly by the evidence of Dr. Stauffer of Priest River, Idaho. That Dr. Stauffer, while practicing medicine in Dover, Idaho, on the 8th day of September, 1927, was called upon by claimant, Victor E. Arneson, at the office of said doctor and at that time claimant had a discharging wound on the back of the right middle thigh; that another place on said claimant just below said discharging sinus was about ready to break and Dr. Stauffer opened said gathering and from said wound there was discharged some straw colored watery fluid; *that on the back of the left knee and opposite the knee joint the said Arneson had a discharging sinus from a deep retracted scar;* . . . . that Dr. Stauffer advised Arneson at that time and place that he, *Arneson, was suffering from tubercular osteomyelitis;* . . . . that Dr. Stauffer has the above mentioned notes in his possession and if allowed will present them to the Industrial Accident Board. . . . . "

Respondent's past history and his osteomyelitic condition and treatment therefor were inquired into at length and fully covered by physicians called as witnesses for appellant, and the desired testimony of Dr. Stauffer, if adduced at the hearing would have been merely cumulative and we do not believe that it would have been sufficient to have impeached respondent, or show that he had willfully withheld testimony of the treatment of Dr. Stauffer, since he was not asked concerning this matter. True, appellants say they did not know of this testimony and therefore could not inquire, but we do not believe the entire circumstance requires a rehearing merely for the purpose of admitting this testimony.

Respondent was refused medical or surgical assistance by Dr. Page, appellant's contract doctor, on the ground he had suffered no compensable injury nor contracted a disease while in appellant's employ. Respondent secured medical and surgical treatment and hospitalization from Dr. Wendle, and sought, and was granted by the board, reimbursement therefor. Such a claim was under similar circumstances allowed in *Johnston v. A. C. White Lumber Co.*, 37 Ida. 617, 217 Pac. 979, but the point herein involved was evidently not raised therein.

Appellants urge the board had no jurisdiction to order this reimbursement and that respondent having waived the provisions of sec. 43–1107, I. C. A., any relief under sec. 43–1108, I. C. A., must be had in an independent action as for breach of contract. Having waived sec. 43–1107, I. C. A., respondent's rights are to be measured under sec. 43–1108. The difference between the two is that under sec. 43–1107 the employee is directly entitled to secure medical assistance if not given by the employer and compel reimbursement from the employer, but no sick benefits are given. Under sec. 43–1108 sick benefits are given but no statutory reimbursement.

On the other hand if there has been a compensable accident the hospital contract, under sec. 43–1108, requires medical treatment and a special bond to insure the same is required by sec. 43–1109, I. C. A., as an optional prerequi-

site to the approval of the contract by the board. It is, therefore, apparent the legislature intended the employee should have means of redress if the treatment was wrongfully refused under sec. 43-1108. A liability exists resting on the employer at least (whether and to what extent on the company doctor we do not say because not raised) for breach of sec. 43-1108.

The precise and single question herein is whether the board has jurisdiction to determine whether there is such liability and if so the amount thereof, or whether such determination is for an independent court action.

Decisions of the courts on somewhat closely analogous questions under statutes not sufficiently similar to ours or not raising the precise question, are not particularly helpful nor controlling. (Annotations, 33 A. L. R. 1204.) It is primarily a question of legislative intent as expressed in the statute directly or by necessary implication. The Workmen's Compensation Act was originally passed as an entire complete act: 1917 Session Laws, chapter 81, page 252, and is, therefore, to be construed and considered as a whole. The pertinent statutory provisions are: First, sec. 43-902, the declaration of the police power and purposes of the statute, compensation for industrial injuries without fault of the employer and regardless of the fellow-servant rule, assumption of risk, or contributory negligence were the new and general features of the act.

Hospital contracts based on contribution by the employee covering injuries and sickness were in existence before and at the time of the passage of this act and breach thereof gave the employee an action for damages, in which the usual measure was the amount paid by him or incurred sufficient to have secured competent medical attention, etc. (39 C. J. 240, sec. 348.)

Section 43-1108 recognizes the right of the employee and employer to, by agreement, enter into such arrangement, which both by reason of the general law theretofore applicable to such agreements and the evident purpose and effect of sec. 43-1109, I. C. A., contemplates redress to the employee for breach of such agreement.

Any question arising under such agreements are, however, questions under the act because the act grants the right to make such contract; in other words, if sec. 43–1107 had been the only statute, no such agreement as authorized by sec. 43–1108 could have been made because of the mandatory and exclusive language of sec. 43–1107 and similar language in regard to other features as secs. 43–1103 and 43–1006, I. C. A.

The language in sec. 43–902 is sufficiently broad to include hospital contracts and rights and liabilities thereunder as being under the jurisdiction, in the first instance, of the Industrial Accident Board and such has been held not unconstitutional as infringing or contrary to article 2, section 1, or article 5, section 2; 71 C. J. 290, section 35.

The legislature has given the board jurisdiction as an investigating and fact finding administrative board of all questions, not otherwise settled, arising under and from the act, sec. 43–1413.

The question of compliance by the employer and his contract physician or hospital is under the supervision of the board as to "services and treatment" which must mean the kind of services and treatment, i. e., competent or negligent, adequate or inadequate, and if the board has supervision of the services and treatment, wrongful neglect or refusal to give any is as much included in such supervision as negligent treatment, and sec. 43–1109 requires a bond be given and filed with the board, to be approved by it, guaranteeing that it will "faithfully furnish" such treatment. Wrongfully refusing any care would certainly not be "faithfully furnishing." To say that the board has jurisdiction to determine whether treatment given is faithful performance but not to determine whether treatment should be given at all, which depends solely upon whether there was a compensable accidental injury, which question concededly the board alone has jurisdiction over, is a *non sequitur*. The bond being filed with the board, the amount of recompense is likewise a question for the board's determination; not as damages but as a question arising under the statute, and in line with sure, certain, inexpensive and prompt relief and aid to the

employee, with full opportunity to the employer, insurance carrier, or other interested party to present any available defense with adequate court review.

The board thus clearly having jurisdiction and no question being raised, as to the amount of the payment or who is responsible therefor, for reimbursement for medical treatment, it, with the order for compensation, is affirmed.

Holden, C. J., and Morgan and Budge, JJ., concur.

Ailshie, J., did not participate.

Petition for rehearing denied.