(No. 6984.  February 4, 1943.)

A. N. LAY, Appellant, v. IDAHO STATE SCHOOL AND COLONY, Employer, and STATE INSURANCE FUND, Surety, Respondents.

[133 Pac. (2d) 923.]

Hamer H. Budge and E. B. Smith for appellant.

Frank L. Benson for respondents.

GIVENS, J.—Appellant, December 15, 1931, during the course of his employment with respondent Idaho State School and Colony suffered a concededly compensable accident, rupturing the entire length of a former appendectomy incision in his right, lower abdominal wall, thereby suffering a large ventral hernia. He received hospitalization and compensation therefor, the latter ending July 30, 1934.

Appellant contends that since that time, though then discharged as surgically healed, he has been, as an aftermath of the accident, totally and permanently disabled physically and mentally by psychosis and neurosis, and on an application for additional compensation sought and obtained from the Industrial Accident Board a hearing October 14, 1941. The board granted additional compensation for permanent partial disability comparable to 50% of the

amputation of the foot at the ankle, amounting to $13.10 a week for 99% of 62½ weeks, beginning July 30, 1934. November 7, 1941, appellant sought a rehearing and a reopening of the matter to introduce newly discovered testimony of three physicians who had not theretofore examined him or testified, asserting in support of such application by affidavit of one of his attorneys that:

"claimant could not with reasonable diligence have discovered and produced same at said hearing, because claimant was absolutely without funds to procure medical testimony of any kind and, that since October 14, 1941, the date of the said hearing, he has been examined by the three doctors of medicine herein above named, as a prerequisite to claimant's becoming entitled to and being placed upon direct relief from Canyon County, Idaho, and said physicians were paid for such examinations by said county;

"That all of said doctors of medicine will testify that claimant now is, and continuously for a long time last past, has been permanently and totally disabled for work and unable to perform any labor for compensation or profit on account of the large ventral hernia and weakness of his abdominal wall with which claimant is afflicted, as the result of the personal injury which he sustained caused by an accident on December 15, 1931, arising out of and in the course of the employment which claimant had on December 15, 1931 with the defendant, Idaho State School and Colony, employer;

"That by virtue of the facts herein set forth constituting the newly discovered evidence desired to be presented herein and because of claimant's inability to produce such evidence at the time of the hearing aforesaid for the reasons stated, affiant alleges that this is a proper case for the Industrial Accident Board, in the exercise of its sound discretion, to reopen in order that such evidence may be received herein, to the end that substantial justice be done."

At the hearing on October 14, appellant introduced the testimony of Dr. Mangum, who had examined appellant and who testified from such examination and hypothetical questions that appellant would not have his present disability had he not sustained the injury of December 15, 1931, and that the degree of disability was 66 2/3% of the loss of the arm at the elbow, or compensation for 66 2/3% of 220 weeks.

Dr. Pittenger examined appellant and wrote the following letter, which was by stipulation considered to be the testimony the doctor would have given if called:

"As per Mr. E. B. Smith's request Mr. A. N. Lay presented himself on October 2, 1941 for an examination and report as to what in my opinion was the amount of permanent disability he sustained on December 15, 1931 while in the employ of the State School and Colony at Nampa, Idaho.

"He stated he was standing on a step-ladder: the ladder fell and threw him on the right side. About five days after the accident he consulted Dr. George Proctor who did not believe the accident was of much consequence. Five months later he was under the care of Dr. Kellogg and was operated on in May, 1932 and again in May, 1934. The first operation was for a ventral hernia, and the second operation was for the recurrence of same. He has never worked since the date of his injury.

"Present complaint: He complains of a hernia at the site of the old scar. He states the pain is very exquisite if he moves about much and that he cannot go without an expensive belt. He is unable to stand or sit for any length of time. He is unable to do any manual labor of any description.

"Physical examination: This man is 53 years of age and is exceedingly obese. He weighs 270 pounds.

"I was unable to demonstrate a hernia at the site of the old scar, although in my opinion there is some weakness of the muscles which is probably due to innervation.

"I am of the opinion that this man is not totally disabled and that his disability is 50% as compared to the loss of the foot at the ankle because of the weakness of the abdominal wall."

Dr. Kellogg, the operating physician, and who had treated appellant and later examined him, wrote a letter which was likewise admitted under stipulation as testimony, as follows:

"Mr. Lay walked into the office accompanied by his wife, erect and active. He is a robust male, 56 years of age and very fat, in fact, he is so fat he wheezes on the slightest exertion.

"Occupation: He claims complete disability since his original injury.

"Chief complaint: He claims total disability since December 15, 1931. He does not sleep well at night, has pain in his side which awakens him every hour and he must change his position. If he attempts to do anything, he gets nauseated and falls over backwards in a faint. He feels that his faintness and nausea is due to a strangulation of his hernia and his wife reduces this strangulation by lifting his hips off the floor and giving a sudden jerk. He has frequent pain in his side which feels like an innertube being inflated but by lifting on the side of the abdomen over the hernia it eases off. He states that the only way he is perfectly free from pain is to sit straight in a chair with his abdominal belt properly adjusted. The slightest turn of the body will cause a recurrence of pain which is the same as when lying down at night.

"Past history: He has never had a serious illness until he received this injury.

"Hospital admissions: May, 1928, Nevada City Sanitarium, hernia repaired; September, 1931, Samaritan Hospital, Nampa, appendectomy; May, 1932, Mercy Hospital, Nampa, postoperative hernia; May, 1934, Mercy Hospital, Nampa, recurrence of hernia.

"When first seen by me in 1932, he had a hernia throughout the entire length of his old appendicitis incision. The incision had been made obliquely in the abdominal wall and was twenty centimeters in length. The entire wound had opened producing an enormous hernia. My report shows that the margin of the amentum and three loops of the ileum were adherent in the hernia sac. The omentum was divided between ligatures and dropped in the belly. The adherent loops of the ileum were detached and the raw surfaces covered by an infolding Lembert suture of plain No. 1 gut. The peritoneum was closed with No. 1 plain. The fascia was stripped of all fat and closed with two rows of chromic No. 2, the surfaces being overlapped three centimeters. He made an uneventful recovery and was discharged from the hospital on the twenty-first day. He was instruced to be quiet at home and put no strain on the abdomen for three weeks.

"He was ordered back in May, 1934, for a secondary operation. Examination showed a slight bulging at the upper part of the old wound with no hernial opening. My notes on his physical examination begin in this manner,

"He is a strong, robust man, and, in my opinion, the ill effects of this partial recurrence is entirely psychic."

"My record on the second operation shows the abdominal wall bulging over a small area. This was due to a thinning of the abdominal wall with no actual hernia. The omentum was found adherent to the operative site. The intestinal loops repaired at the previous operation were perfectly normal with no adhesions whatsoever. I made a semicircular incision around the margin of the thinned area and sutured the entire flap to the surface of the normal belly fascia with three rows of No. 2 chromic gut. He made an uneventful recovery until the thirteenth day when, through some misunderstanding, he was permitted to go home without orders. The order for discharge reads as follows, '6-7-34. May go home. Verbal order, Doctor Kellogg, Per H. Betts.' Underneath in my handwriting, 'Countermanded, Doctor Kellogg.' In the nurses notes of the same day, it reads as follows, '3:30 P. M., patient dismissed from hospital. Carried out in wheelchair. Per H. Betts.' '5:00 P. M. 6-11-34. Patient reentered hospital. Walked in. Assigned to Room 203.' Later in the day, he was moved to the men's ward. Everything seemed perfectly all right until the afternoon of the fifteenth when he got out of bed and walked across the room. Four days later he was found sitting on the edge of the bed, swinging his feet. He awakened the next morning at 1:00 and was very disagreeable refusing to lie down in bed, getting up and standing on his feet. The following day he walked out to the chart desk. The nurse sent him back to his room, but he sat in a chair for an hour and refused to go to bed. Later in the afternoon, he was up walking about the room or sitting quietly in a chair. He refused to go to bed until 9:00 that night then slept well throughout the night.

"The following morning, June 22, he was up walking about, very haughty and angry. I was called. The final note in my Progress Notes, reads as follows, 'Patient in maniacal anger. Demanded that he be given his clothes and allowed to leave the hospital. He was absolutely uncontrollable. He left the hospital thoroughly understanding that he was disobeying orders and refusing treatment.'

"The patient now states that for a long time he had a pain in his right heel which felt like a butcher's knife being twisted around. He tried heat, arch supports, and many other things but finally found that it was due to

faulty support of the abdominal wall. He got a new belt, adjusted it, and the pain left his heel. Now, so long as he keeps his belt properly adjusted and the abdominal wall well supported, he has no pain in his heel. He has a large wooden seat, with arms and high back built facing the highway and he sits in this chair day after day. He states that as long as he sits perfectly straight, he is free from pain and comfortable.

"Physical examination: Temperature 98.6°, height 5'10", normal weight 175 pounds, present weight 270 pounds, pulse 70 regular, blood pressure 138/92, respiratory rate 17—character, uniformly full and free. His appearance is healthy. He stands and walks very erect. His color is good. His skin is clear. His reflexes are normal.

"His general physical examination is essentially negative aside from the operative site in the right abdomen. The scar of the original incision runs obliquely across the right side of the lower abdomen following the general direction of the external oblique muscle. It is twenty centimeters in length. The entire abdomen is solid fat and quite pendulous. The central portion of the scar shows a slight bulging, apparently due to a thinning in the scar tissue at the center of his old incision and immediately below the last thinned area that I repaired. This bulge is eight centimeters in length and four centimeters in width. There is an impulse on coughing but straining does not cause a hernia to protrude.

"This is the first time that I have examined this man since he left the hospital. He states that he has led an absolutely sedentary life since his hernia was repaired and has simply grown fat. In my opinion, no amount of repair-work would support the weight of his enormous belly completely. My previous experience with and knowledge of this man would render it difficult for me to give absolutely unbiased opinion of his present condition, therefore, I submit this report to you with the request that you have some disinterested doctor or doctors go over my report and examine this man and report his condition to you."

The appeal presents as error the board's refusal to reopen the case and to award permanent total disability.

In *Dehlin v. Shuck*, (Ida.) 124 Pac. (2d) 244, the hearing was held May 13, 1941, and concluded May 27, 1941. Application for rehearing was made June 24, 1941, 28 days later. In the instant case the hearing was con-

cluded October 14, and the application was made November 7, 24 days thereafter. The statute does not specifically provide for a rehearing by the board from a hearing by the entire board, only by the board from a hearing by one member. (Sec. 43-1404, I. C. A.; *Taylor v. Blackwell Lbr. Co.*, 37 Ida. 707, 218 Pac. 356; *Delich v. Lafferty Shingle Mill Co.*, 49 Ida. 552, 290 Pac. 204; *Fields v. Buffalo-Idaho Min. Co.*, 55 Ida. 212, 40 Pac. (2d) 114; *Arneson v. Robinson*, 59 Ida. 223, 82 Pac. (2d) 249.) The court has nevertheless recognized such procedure in *Arneson v. Robinson,* supra, though denied therein, and in *Dehlin v. Shuck,* supra. The showing herein is comparable to that in the latter case, which announced a most liberal rule, thus:

" 'where the parties fail to produce satisfactory evidence upon any question of fact material and necessary to the decision of the case, then, * * * "It becomes the duty of the board to make full and exhaustive inquiry * * *, and to that end the board may not only examine any competent witness at the conclusion of his direct and cross examination upon all matters material and relevant to any issue, but it may also subpoena and examine other competent witnesses." '

* * * *

"During the first hearing of this case, appellant testified there was a witness to the conversation, other than the parties thereto, between Keating and himself, as to what Lloyd said with respect to insurance. At the second hearing, Keating testified there were two such additional witnesses to that conversation. Upon learning of these witnesses, it was the duty of the board, of its own motion, if the parties made none, to take steps to produce the witnesses and secure their testimony."

Herein two of the physicians who testified for appellant at the hearing fixed his disability at less than permanent total. The other physician refused to give an estimate. The asserted newly discovered evidence would directly contradict the two physicians thus testifying, in this, that the disability in the opinion of the three physicians whose testimony is sought is, of course, much greater than that testified to by the physicians at the hearing. It would seem that appellant has brought himself within the liberal rule announced in *Dehlin v. Shuck,* supra, and see *Kearns v. City of Torrington*, 119 Conn. 522, 177 Atl. 725; and

aside from the expense incident to a further rehearing, no prejudice to respondent is shown, and no contrary showing interposed to the application for the hearing.

The remand of the case for rehearing obviates the necessity of deciding the other alleged error.

The cause is reversed and remanded with directions for the board to hear the testimony of the three physicians offered by appellant and any further testimony which either side may desire to present.

Respondent dismissed its cross-appeal, so we do not consider procedural matters broached by it.

Costs awarded to appellant.

Holden, C.J., and Winstead, D.J., concur.

AILSHIE, J. (Dissenting)—A rehearing in a trial court has the same effect as the granting of a new trial or opening up a default has in the same court. It results in a new trial of questions of fact. (Sec. 7-601, I. C. A.; *People v. George,* 3 Ida. 108, 112, 27 P. 680; *Kimple v. Conway,* 69 Cal. 71, 10 P. 189, 190; *People v. Lopez,* 43 Cal. App. 2d Supp. 854, 110 P. 2d 140, 147; *City of Los Angeles v. Morris,* 74 Cal. App. 473, 241 P. 409, 411-12.)

Even though a rehearing (or new trial) had been granted by the board in this case and all the proposed new evidence had been adduced in the most favorable light contended for by appellant, still it would have been within the power of the board, passing upon conflicting testimony, to have denied the relief sought and to have made the same order, originally made. After examining the showing for a rehearing, the board evidently thought the proposed evidence, if given, would not change or alter their conclusions.

It is apparent, from the statement of Dr. Kellogg, that he did not think or, at any rate, doubted whether appellant's claim was meritorious. The same is true as to the testimony of Dr. Pittenger. There would have still been a conflict in the evidence; and the board would have had a right to believe the testimony sustaining the order which they had originally made. In this view of the case, it can not be said that the board abused its discretion in denying a rehearing on the issues previously submitted.

It is a well established rule of this court, that the granting or refusal to grant a new trial or vacate a default or refuse to do so, is in the sound discretion of the court to

which the application is made and will not be disturbed on appeal except for a clear *abuse of discretion.* Here we should not forget that the Industrial Accident Board is vested by the constitution with exclusive power and authority to determine the facts in these cases. (Amendment to sec. 9, art. 5 of the Constitution, 1937 Sess. Laws, p. 498.) That jurisdiction and authority applies as well to the granting of a rehearing (or new trial) as it does to the actual trial of the case in the first instance.

The order or judgment of the board should be affirmed.