452 P.2d 61

**Robert K. SCOTT, Claimant-Appellant,**

**v.**

**ASLETT CONSTRUCTION COMPANY, Inc., and Employers Mutual Liability Ins. Company of Wisconsin, Defendants-Respondents.**

**No. 10070.**

Supreme Court of Idaho.

Dec. 31, 1968.

Rehearing Denied March 24, 1969.

John W. Gunn and Brauner, Fuller & Doolittle, Caldwell, for appellant.

Gigray, Boyd & Downen, Caldwell, for appellee.

· SMITH, Chief Justice.

This proceeding arises from a personal injury caused by an accident which claimant-appellant received during the morning of October 7, 1963, arising out of and in the course of his employment as a heavy duty mechanic by respondent, Aslett Construction Company. On that date the employer had insured its workmen's compensation liability with respondent, Employers Mutual Liability Insurance Company of Wisconsin.

The injury occurred while claimant was attempting to loosen a bolt on a track roller of a caterpillar tractor. The bolt snapped as he applied a great deal of force to it, throwing him backwards to the ground. He immediately felt a "burning" sensation, "similar to an electric shock." He arose, walked about for about thirty minutes, then resumed work, unaware that he had been injured. An hour or so after the accident he felt worse, and during the afternoon his supervisor sent him home. He was able to continue work for three or four days, but with increasing difficulty.

October 15, 1963, Dr. Montgomery of Caldwell diagnosed claimant as suffering hemorrhaging hemorrhoidal tags, of which he had some history, and severe back pain. The doctor then referred claimant to Dr. Baranco, a Caldwell orthopedic specialist. October 21, 1963, Dr. Baranco diagnosed deep tenderness in the muscles of claimant's lower back. He prescribed a therapeutic corset and administered daily diathermy treatments.

Almost a year earlier, November 30, 1962, claimant had previously visited Dr. Baranco, complaining of pain in his lower back and right leg. Dr. Baranco recommended

postural training and flexion exercises. There were no·follow-up visits. Appellant's next visit to Dr. Baranco was the October 21, 1963, visit, following the accident, and when Dr. Baranco concluded that claimant had much the same condition as in 1962.

December 5, 1963, at claimant's request, respondent surety referred appellant to Dr. Shaw, a Boise orthopedist. Dr. Shaw agreed with prior diagnoses, noting generally normal mobility and coordination, but also continued tenderness, in the lower back. He too, recommended postural exercises and utilization of a therapeutic corset. If pain continued, Dr. Shaw indicated that myelographic studies should be considered.

Claimant continued his visits to Dr. Shaw during the ensuing year; he continued to complain of a back pain, sometimes radiating into his right leg and foot. Dr. Shaw advised the continued wearing of the corset and exercise. During that period the doctor admininstred pain-relieving injections; also, by operative procedure, under local anesthetic, he removed a herniating fat pad, as a suspected partial source of claimant's discomfort. That treatment produced no significant improvement since claimant continued to suffer discomfort.

January 8, 1965, claimant, at his request, was examined by Dr. Burton of Boise, another orthopedic specialist, who diagnosed a disc injury in claimant's lower back; the doctor recommended a myelogram and indicative treatment.

February 23, 1965, claimant wrote the surety requesting an authorization for a myelogram. The surety refused the request by a letter dated March 30, 1965.

March 17, 1965, at respondent surety's request, claimant was again examined by Dr. Baranco, who found no evidence of a fracture or dislocation. The doctor diagnosed a degenerative but not ruptured disc, some arthritic condition, and minimal physical evidence of subjective complaints. While he did not recommend treatment, he indicated that appellant's degree of permanent disability attributable to the accidental injury was equivalent to 10% as compared to the loss of one leg at the hip. This was the only percentage rating made by any physician prior to the first award in this proceeding.

April 19, 1965, claimant petitioned the Industrial Accident Board for an award for past and future medical expenses and for compensation from December 22, 1964. Claimant alleged that he had been unable to work since that date. A hearing on the petition was had June 2, 1965.

As a result of the hearing the board, as of August 24, 1965, approved payment by the surety of medical expenses through October 17, 1964, and payment to claimant of compensation for total disability for two separate periods, the second of which terminated December 21, 1964. It then awarded claimant compensation for a residual permanent partial disability equivalent to 25% as compared to the loss of one leg at the hip, i. e., 45 weeks at the rate of $30.00, totaling $1,350.00, payable from and after December 21, 1964.

August 25, 1965, the day after the board's award, on his own initiative and without attempting authorization from either the respondents or the board, and without notice to either, claimant arranged for a complete internist's examination by Dr. Stones of Caldwell. From August 31, 1965, through September 2, 1965, Dr. Stones caused claimant to be hospitalized at Caldwell Memorial Hospital, where additional tests (including a myelogram) were performed and x-rays taken. Dr. Stones testified concerning his findings:

"The myelogram showed disruption of the intervertbral disc between the 3d and 4th lumbar vertebrae with posterior bulging into the dural sac, the same sac which contains the spinal cord and nerve filaments on the distal end of the cord.

*     *     *     *     *     *

"The findings on the routine x-rays series: * * * Quite marked arthritic change of the apophyseal joints between the vertebrae, a disruption of the soft

tissue, such as to permit a sliding forth of one vertebra on top of another, namely, the 4th lumbar vertebra in this case, and posterior disruption of a disc.

"This is precisely the cluster of findings one would expect in an injury which involved sudden and violent forceful hyperextension of the spine—the upper part of the body being suddenly thrown in a backward direction.

\* \* \* \* \* \*

"My opinion was that this patient's symptoms would never be resolved \* . \* \* and that a progression of his difficulties would not be halted until such time as the lower spine was fused to stop all motion between all joints of the lower spine."

September 23, 1965, as a result of Dr. Stones' findings, claimant filed a "Petition for Rehearing" on the grounds "(1) That there has been a change in petitioner's condition, and (2) That since the award, new evidence has become available after petitioner had submitted himself to a myelogram stduy \* \* \* which \* \* \* indicated the petitioner's need for spinal surgery."

Dr. Stones referred claimant to the Mayo Clinic in Rochester, Minnesota, where more tests and another myelogram were performed in November, 1965. Neither Dr. Stones nor appellant had informed respondents or the board, or sought their authorization, for the work of Dr. Stones or the referral to the Mayo Clinic. November 10, 1965, a physician of that clinic wrote the clinic's findings to Dr. Stones as follows:

"In view of the negative myelogram and negative neurological, but definite skeletal changes, I thought it best to treat Mr. Scott with a supportive brace, exercises and heat, and see what a little further time would do for his back. He would limit his activities only by what was painful. We would like to hear from him again in three months."

November 4, 1965, the board heard claimant's "Petition for Rehearing." The board rejected respondents' motion to dismiss the petition, and continued the proceeding.

February 2, 1966, claimant returned to the Mayo Clinic, where he was hospitalized until February 15, 1966. As reported in a letter dated February 11, 1966, from a physician of the clinic to Dr. Stones, claimant submitted to another myelogram and then to an exploratory operation of the right fifth lumbar and first sacral nerve roots. The doctor found what seemed to be an impingement of the fifth lumbar nerve root on the right by an enlarged hypertropic facet which also contained a loose osteocartileginous body. The nerve was decompressed and a fusion made of L–4, L–5 and sacrum.

February 22, 25 and March 8, 1966, claimant visited Dr. Stones. May 4, 1966, at the behest of the Mayo Clinic, Dr. Stones took further x-rays of claimant's lumbar spine. The doctor then concluded that fusion was not yet complete, and that claimant was still unable to do the type of work to which he was accustomed.

The doctor considered that prior to the October 7, 1963, accident claimant had more osteoarthritis than the average person of his age, but that outside of being injured, this would not have become sufficiently symptomatic to really bother the patient. It was also his opinion that the osteocartileginous fragment found and removed during exploratory surgery was the result of the trauma of October 7, 1963.

May 4, 1966 (more than 6 months after the initial award of August 24, 1965), appellant filed a "Supplemental Petition" with the board. July 15, 1966, the two petitions came before the board for hearing. Dr. Stones gave the only medical testimony at that hearing; he reiterated much of what is hereinbefore stated. At the time of the hearing the fusion was still not complete. Dr. Stones' prognosis was as follows:

"With adequate fusion obtaining the residual degree of pain will limit this patient to somewhere between a third and fifty per cent disability for the kind

of work which he has been accustomed to doing."

Subsequent to this latest hearing claimant once more visited the Mayo Clinic, again without previous authorization from respondents or the board. In a letter dated November 15, 1966, to claimant's attorney, Dr. Stones stated the following:

"A letter dated 7 November, 1966, was received from the Mayo Clinic in which the view was expressed that the patient's persistent symptoms represent nerve root injury sustained from the prolonged compression. It was their opinion that the fusion of the lower spine and sacrum had occurred. It was their further opinion that Mr. Scott may now participate in physical activities as his symptoms permit."

Dr. Stones then made a final rating of disability:

"It is the opinion of the undersigned that this patient is permanently partially disabled. The combination of the fusion, and symptoms considerably limit his ability to flex the spine. Thus, he is considerably limited in the amount of bending, stooping, or squatting that he can do. A lack of mobility and his symptoms preclude his working in the many body positions that his usual kind of work demands. It is further the opinion of the undersigned that this patient's back (which was previously asymptomatic even though there was "x-ray osteoarthritis") was severely injured at the time of the accident in October 1963. The degree of Mr. Scott's disability for the type of work for which he is trained is at least equivalent to the loss of one lower extremity at the hip."

January 26, 1967, Dr. M. B. Shaw of Boise again examined claimant at the surety's request. The concluding paragraph of the doctor's letter of that date is significant:

"I feel that this man, and have felt all along has a tremendous psychosomatic overlay and that his problems primarily are on this basis rather on the basis of organic pain. I would agree with Dr. Stones that this man has a significant permanent partial impairment. However, I am unable to separate, because of the marked psychic overlay, the actual effects of the injury and any psychosomatic problem and would, therefore, allocate 50% of his permanent impairment of 100% as compared to loss of a leg at the hip to psychic aspects and 50% to any and all residual from actual organic changes due to an injury. I believe for the patient's own best interests, that this case should be settled since more treatment apparently only produces more symptomatology."

The board's "ultimate findings and rulings" set forth in effect the following:

Claimant was surgically healed as of November 15, 1966, the date of Dr. Stones' last letter.

Claimant failed to prove by sufficiently documented bills, the nature of his treatment at the Mayo Clinic.

It is immaterial what the extent of claimant's expenses were (Dr. Stones' and Mayo Clinic) since they were not authorized by the board, the employer, or the surety. (It is noted that the doctors whom claimant visited repeatedly recommended a myelogram; also, by letter of February 23, 1965, to the surety, claimant requested a myelogram which request the surety refused on March 31, 1965. This refusal was six months prior to the first hearing in this case.) Claimant was not entitled to reimbursement of any medical and kindred expenses incurred from the time of the initial hearing.

Claimant was *totally disabled* from August 24, 1965, to November 15, 1966, and is entitled to compensation since the Mayo Clinic did discover additional defects which were previously unknown.

The board then made an "award on modification" in claimant's favor:

For additional total temporary disability for work for the period from February 11, 1966, to November 15,

1966,—39⅗ weeks at $37.00 totaling $1,464.14.

Accepting claimant's permanent partial disability as equivalent to the loss of a leg at the hip, the board apportioned 40% thereof to conditions pre-existing the date of the accident and 60% to the accident itself. Subtracting the permanent partial disability compensation previously awarded of 25% equivalent loss of one leg at the hip, the net modification award amounted to 35% equivalent loss of one leg at the hip, which allowed compensation for 63 weeks at $30.00 totaling $1,890.00.

■ Claimant first contends that the board erred in not granting his "Petition for Rehearing" filed September 23, 1965. He admits that I.C. § 72-604[1] provides specifically only for rehearing in case of a prior hearing by a single board member; but he cites Lay v. Idaho State School and Colony, 64 Idaho 455, 133 P.2d 923 (1943) for the proposition that a full rehearing by the whole board, after an award by the whole board, is sometimes warranted. That is correct, but only in the case "where the parties fail to produce satisfactory evidence upon any question of fact material and necessary to the decision of the case." 64 Idaho at 462, 133 P.2d at 926.

The board treated the petitions of claimant as a petition for modification based on a change in condition. But even though claimant now claims that there was no *change* in condition, he did allege that there had indeed been such a change, to-wit:

"The employee, claimant Robert K. Scott, respectfully requests a rehearing before the Board in the above captioned case on the ground that further medical examination, in the form of a myelogram performed upon petitioner, has revealed evidence of a change in petitioner's condition as the same has heretofore been made to appear in the records and files before this Board."

■ In fact, there is no allegation that the board did not make its findings based on all the evidence which was available at the time. Moreover, since the May 4, 1966, petition, denominated "New Evidence on Petition for Rehearing," reiterated the *change* in claimant's condition, and was filed more than six months after the original award, it was reasonable and proper for the board to have treated this as a normal application for modification of an award, as provided by I.C. § 72-607,[2] which it did.

1. 72-604. Hearing—How and where conducted—Effect of member's decision.—The board, or the member of the board to whom the matter has been assigned, shall make such inquiries and investigations as shall be deemed necessary. The hearing shall be held in the city or town, or in such other convenient place within the county where the accident occurred, as the board may designate, and the decision of the board, or the decision of the member to whom the matter may have been assigned, together with the transcript of the evidence, findings of fact, rulings of law, and any other matter pertinent to the questions arising during the hearing shall be filed in the office of the industrial accident board. A copy of the award shall be immediately sent to the parties by United States mail. If the matter has been assigned for hearing by a member, and a claim for a review is not filed by any party to the proceeding within thirty days after his decision is filed, the member's decision shall be the decision of the board and shall be enforceable under the provisions of section 72-610.

2. 72-607. Modification of awards and agreements.—Time within which made.— On application made by any party within four years of the date of the accident causing the injury, on the ground of a change in conditions, the board may at any time, but not oftener than once in six months, review any agreement or award, and on such review may make an award ending, diminishing or increasing the compensation previously agreed upon or awarded, subject to the maximum and minimum provided in this act, and shall state its conclusions of fact and rulings of law, and immediately send to the parties a copy of the award, but this section shall not apply to a commutation of payments under section 72-321.

In Hustead v. H. E. Brown Timber Co., 52 Idaho 590, 17 P.2d 927 (1932), the employee accepted an award of temporary disability, but later discovered that he was in reality permanently disabled. Upon receiving a petition for modification, the board found that there had been a change in condition; the employer appealed on the ground that there had been no change in condition. This Court, while conceding that the only conclusion to be drawn from the record was that all parties were honestly mistaken as to the nature and extent of the injury at the time of the award, nevertheless held that the disability subsequently discovered was a change of condition sufficient to authorize invoking relief under the modification of awards statute.

■ So here, the additional facts, adduced from later examinations, furnished the board sufficient facts upon which to base a modification of award resulting from a change in condition.

Moreover, claimant made no showing that he was unable to introduce all the medical evidence which he had available. On the contrary, there were two hearings before the board subsequent to the original award. The record is replete with additional medical records and testimony, and only at the conclusion of all such proceedings did the board modify its prior award. It is impossible to discern any prejudice to claimant in not having been accorded the full "rehearing" he now demands.

' ■ Claimant also contends that there is an absence of substantial and competent evidence to support the board's finding (June 8, 1967), that his disability, although equivalent to the loss of a leg at the hip, should be apportioned in the amount of 40% as attributable to conditions antedating the compensable injury, and 60% to the injury. The applicable statute on apportionment for pre-existing conditions is I.C. § 72–323, which states in part:

"If the degree of duration of disability resulting from an accident is increased or prolonged because of a preexisting injury or infirmity the employer shall be liable only for the additional disability resulting from such accident."

This Court has interpreted the meaning of this particular section of the Workmen's Compensation Law. We reaffirm herein our holdings expressed in this area in Wilson v. Gardner Associated, Inc., 91 Idaho 496, 426 P.2d 567 (1967), and Dawson v. Hartwick, 91 Idaho 561, 428 P.2d 480 (1967). In particular, this Court, in Wilson v. Gardner Associated, Inc., supra, made an exhaustive review of Idaho's legislative history and case law in this area. It establishes unequivocally the central point:

"Subsequent to enactment of this provision [I.C. § 72–323] this court has recognized that apportionment of compensation is to be made as between disability caused by or resulting . from industrial accident and disability caused by or resulting from pre-existing injury, *disease* or condition residual from previous injury, and that the ratio of apportionment is for the board's determination." (Emphasis supplied)

■ In short, if a condition existed prior to the compensable accident, and made the resulting disability more serious than it might have been in the absence of the pre-existing condition, then the board must apportion the disability between the two. That a claimant, prior to the compensable injury, had lost no working time due to the pre-existing condition, is irrelevant for purposes of apportionment.

The question then arises whether there was substantial and competent evidence for the board's finding of a pre-existing condition of osteoarthritis in this case.

Dr. Baranco examined claimant on November 30, 1962, almost a year prior to the accident. He was the only doctor who had seen appellant as of a time prior to the accident. At that time, claimant's complaint was pain in the lower back and pain in the right leg. X-rays showed some narrowing of the lumbosacral disc space with early traumatic or hypertrophic changes in the lumbar spine. When Dr. Baranco examined claimant on October 21,

1963, after the accident, he found the complaints essentially the same as a year earlier, except for some deep tenderness in adjacent muscles. He was of the opinion that claimant suffered an aggravation of a pre-existing condition.

Dr. Stones also admitted claimant was afflicted by a pre-existing condition, but added that some osteoarthritis was an almost universal finding in men of appellant's age.

■■ The board, in its original award of August 24, 1965, noted that both Drs. Baranco and Burton felt that claimant's injury was possibly aggravating a pre-existing condition. Testimony at the three hearings indicates that there was substantial and competent, although arguably conflicting, evidence to support the finding of the board on apportionment. It is not for this Court to review the exact facts of that determination. Wilson v. Gardner Associated, Inc., supra, and cases therein cited. The further rule which emerges particularly from the Wilson v. Gardner case is that, "By I.C. § 72–323 the board is authorized and required to apportion the degree and duration of disability between the injury resulting from the accident and that resulting from any preexisting injury or infirmity."

■■ Moreover, the board's apportionment as between an industrial injury and pre-existing infirmity, where sustained by competent substantial although conflicting evidence will not be overturned on appeal. Dawson v. Hartwick, supra.

Claimant next appeals from the board's denial of medical expenses incurred sub-sequent to August 24, 1966. The board's ultimate ruling on modification, of June 8, 1965, reads:

"It is immaterial what the extent of claimant's expenses or whether he proved them. He incurred them all on his own initiative, without prior request or demand upon the defendants or either or them, and without any attempt to obtain authorization from the Board. The rule is well established in Idaho that a claimant seeking treatment for compensable accidental injury, and particularly additional treatment after an award, must request or demand such from his employer or his employer's surety in advance of such treatment, permitting the employer or surety to designate the treating physician. Only when the authorization for such treatment is refused is the injured man free to seek his own treatment at the expense of the employer or surety. Alternatively, he may petition the Board for such authorization. Under the circumstances appearing in the record herein, the Board rules that claimant Scott is not entitled to reimbursement for the medical and kindred expenses incurred since August 24, 1965, from the defendants herein or either of them."

■ Claimant contends that he did request the surety for a myelogram, in a letter of February 23, 1965, which request the surety refused in writing dated March 30, 1965. Under these circumstances, the appellant had the right, under I.C. § 72–307,[3] to obtain such services independently at the cost of respondent employer or its surety. As a result, the myelogram performed by Dr. Stones on or about Septem-

3. 72–307. Medical attendance.—The employer shall provide for an injured employee such reasonable medical, surgical or other attendance or treatment, nurse and hospital service, medicine, crutches and apparatus, as may be required or be requested by the employee immediately after an injury, and for a reasonable time thereafter. If the employer fails to provide the same, the injured employee may do so at the expense of the employer. All fees and other charges for such treatment and services and compensation therefor shall be subject to regulation by the board. The pecuniary liability of the employer for the treatment and other service herein required shall be limited to such charges as prevail in the same community for similar treatment of injured persons of a like standard of living when such treatment is paid for by the injured person. In determining what fees and charges are reasonable, the board shall consider the increased security of payment afforded by this act.

ber 1, 1965, should be compensable. Since it does not appear from the record or the exhibits exactly what charges relate specifically to the myelogram, such should be determined by the board.

Claimant's contention that he requested additional treatment will not bear close scrutiny. The only request of any kind was embodied in the referred-to letter of February 23, 1965. It would be unreasonable to hold that such letter, requesting a myelogram, a diagnostic aid, would serve as a sufficient request for all the later treatment. Claimant made no request directed to respondents or either of them for any such treatment; nor did he seek authorization thereof by the board. The expense of those treatments and ministrations are not compensable, as the board correctly held. I.C. § 72–307; Findley v. Flanigan, 84 Idaho 473, 373 P.2d 551 (1962); cf. Lane v. General Telephone Company of Northwest, 85 Idaho 111, 376 P.2d 198 (1962).

Claimant asserts the board erred in failing to award him total temporary disability compensation from December 22, 1964, through November 15, 1966. While claimant does not seriously argue the merits of this assignment nevertheless, the board's determination is noteworthy.

The board by its first award granted claimant temporary disability compensation through December 21, 1964. It determined that as of that time claimant's condition had sufficiently stabilized to entitle him to a rating for his permanent partial disability, and thereupon rated such disability to be 25% as compared to loss of one leg at the hip, the benefits for which were paid to him after December 21, 1964, for a period of 45 weeks at $30.00 a week.

Based upon claimant's petitions which the board ruled were for modification of its first award, the board found in effect that a change in condition occurred as of the time of the fusion operation which claimant had performed at the Mayo Clinic, which date the board fixed as of February

11, 1966, the date of a letter relative to the operation written by a physician of the clinic.

The board then ruled that the claimant was entitled to total disability compensation during the ensuing period of convalescence from February 11, 1966, to November 15, 1966, and accordingly awarded him such compensation. As of the latter date, the time fixed as surgical healment, claimant began receiving compensation for his additional percentage of permanent partial disability, which the board awarded.

Again, the board's award for total disability compensation is consistent with its treatment of claimant's petition for modification, and the entire award is fully sustained by the evidence, except in the one aspect as hereinafter ordered modified.

The award of the Industrial Accident Board is modified to the end only, that claimant be awarded the expense for the first myelogram which was performed by Dr. Lyle L. Stones of Caldwell, Idaho, the same to include the necessary attendant services such as x-rays and hospitalization, if such there were.

As so modified the award, and all other orders of the board, are affirmed. Cause remanded for further proceeding consonant herewith.

TAYLOR, McFADDEN and SPEAR, JJ., concur. (Decision reached prior to the retirement of SMITH, C. J., and TAYLOR, J.)

McQUADE, Justice (dissenting).

I cannot concur in that portion of the majority opinion which denies claimant any recovery for medical expenses incurred after August 24, 1965, the date of the initial award of the Board. On February 23, 1965, claimant requested permission of his employer's surety "to have Mr. Scott examined by another orthopedic surgeon and to have a myelogram, if that is necessary * * * [because] there is a strong indication that a disc injury occurred."[1] On

---

1. Transcript p. 123A.

March 17, 1965, claimant was examined at the surety's request. Then on March 30, 1965, apparently because the surety's doctor found "minimal physical evidence of subjective complaints,"[2] the surety refused claimant's written request.

Holding that this request and its rejection did not supply any basis for claimant's self-procurement of medical aid under I.C. § 72–307, the majority state the following:

"It would be unreasonable to hold that such letter, requesting a myelogram, a diagnostic aid, would serve as a sufficient request for all the later treatment. Claimant made no request directed to respondents or either of them for any such treatment; nor did he seek authorization thereof by the board. The expense of those treatments and ministrations are not compensable, as the board correctly held. I.C. § 72–307; Findley v. Flanigan, 84 Idaho 473, 373 P.2d 551 (1962); cf. Lane v. General Telephone Company of Northwest, 85 Idaho 111, 376 P.2d 198 (1962)."[3]

This conclusion is erroneous for several reasons. First, one of the assumptions underlying this conclusion is that a myelogram, as a mere "diagnostic aid," is a relatively minor and unimportant part of the medical treatment of lower back injuries. However, this assumption ignores the facts that several doctors had recommended a myelogram and that the prescription of certain exercises and a brace failed to produce any beneficial results. More importantly, it ignores the obvious fact that a mere "diagnostic aid" is in reality a medical discovery device. To refuse to permit the use of scientific diagnostic aids is in reality to refuse to recognize that an otherwise undiscoverable injury may exist. Just as x-rays may disclose pelvic fractures, for example,[4] so a myelogram

("Roentgenography of the spinal cord after injection of a contrast medium"[5] may disclose spinal injuries. Thus, the scope of the surety's refusal of medical aid in this case is much broader than the majority indicates.

Second, I fail to understand why the terms of a request for medical aid by a layman, whose main concern is simply to get well, should be determinative of the extent of his reimbursement for medical expenses incurred after the surety's refusal even to permit any scientific diagnosis of the injury. The majority ignore in this respect the precise terms of I.C. § 72–307, which are very broad indeed. That section provides in pertinent part that

"[t]he employer *shall provide* for an injured employee *such reasonable medical, surgical or other attendance or treatment,* nurse and hospital service, medicine, * * * *as may be required or be requested* by the employee immediately after an injury, and for a reasonable time thereafter. If the employer fails to provide *the same,* the injured employee may do so at the expense of the employer. * * * " (Emphasis added).

Thus, the employer "shall" provide whatever reasonable care "may be required or be requested," and if the employer refuses to do so the employee may procure "the same" medical aid himself.

Under these terms, claimant properly sought more scientific diagnosis of his injury, including that by means of the process of exploratory surgery. According to the Mayo Clinic surgeon, the surgery disclosed

"an impingement of the fifth lumbar nerve root on the right by an enlarged hypertrophic facet which also contained a loose osteocartilaginous body. The nerve was thoroughly decompressed, and

2. Majority opinion at 3.

3. Majority opinion at ── ─ ──.

4. See Johnston v. A. C. White Lumber Co., 37 Idaho 617, 217 P. 979 (1923).

5. Dorland, Illustrated Medical Dictionary 972 (1965).

we went ahead then with a fusion of L-4, L-5, and sacrum." [6]

The "osteocartilaginous body" was a bone fragment. It would appear that this surgery was statutorily "required" medical aid. Although claimant suffered certain residual pain after surgery, the Mayo Clinic expressed the view that

"the patient's persistent symptoms represent nerve root injury sustained from the prolonged compression [of the dural sac]." [7]

In other words, the residual pain derived from the failure promptly to diagnose and correct the true injury in the first instance. In any event, respondents themselves illustrated by their cross-examination of claimant at the final board hearing that the surgery produced some favorable results:

"Q. Your condition is better now, is that correct, Mr. Scott?

"A. Yes, I have less pain now than I did.

"Q. Do you have more mobility or are you able to get around better?

"A. Well, no. I can't get around too well but I do have less pain.

\* \* \* \* \* \*

"Q. The pain is less now you say?

"A. Yes." (Tr. 115, ln. 1–11).

Third, the *Findley* and *Lane* cases cited by the majority, supra, fail to support the conclusion reached. The *Findley* case involved an employee who failed even to notify his employer that any accident had occured. The Court found that the 85-day delay in notification prejudiced the employer under I.C. § 72–402. In the case at bar, the employer and its surety were fully aware of the injury and of claimant's request for further diagnostic aid. It is difficult to find prejudice here, since the surety undoubtedly would have refused any request for surgery on the ground that

claimant's pain was said to be psychosomatic.

The *Lane* case involved a claimant who had purchased drugs after the cessation of all treatment by his doctors, after he had returned to work, and subsequent to the time he was found to have been surgically healed. In the case at bar, medical treatment had not yet ceased, claimant had not returned to work, and the Board found that claimant was surgically healed only by November 15, 1966, a date *after* the very treatment at Mayo for which claimant is now denied reimbursement.

In these circumstances, the case of Clevenger v. Polatch Forests, Inc.,[8] is much more pertinent. There the claimant was injured in 1955 and received an award in 1959. During the summer of 1960, claimant's back injury became more painful despite the medication and therapy he had been receiving, and he was forced to stop working. During that summer, the claimant failed to obtain authorization from the surety concerning the need for further treatment. No authorization for surgery was obtained. On August 17, 1960, a myelogram was taken, and two days later a laminectomy was performed on claimant's low back. That operation was successful, and claimant returned to work in December, 1960.

This Court held that claimant was entitled to reimbursement for medical expenses incurred after July 29, 1960, under I.C. § 72–307. The Court held that the treatment was sought within a "reasonable time" under the statute because such time is generally "as long as the condition and necessity for treatment exists." [9] The treatment there performed was ultimately found to have been "required" under the statute, since the myelogram and surgery showed scientifically what insufficient diagnosis had failed to show previously. It is significant that the reason for claimant's failure to request such treatment from

6. Claimant's exhibit 13.

7. Claimant's exhibit 22.

8. 85 Idaho 193, 377 P.2d 794 (1963).

9. Id. at 201, 377 P.2d at 799.

the surety was not detailed. Nor, apparently, did it matter that the surety did not give authorization.

The case of McCoy v. Industrial Accident Commission [10] is also persuasive. The California Labor Code § 4600 there construed is in substance identical to I.C. § 72–307. The claimant in that case received a back injury. She was treated unsuccessfully for approximately six months, but in the face of continuing complaints of pain, doctors supplied by the commission and the employer found that further treatment was not required. Treatment was delayed for another six months. Finally claimant visited her own doctor, who referred her to a neurosurgeon who agreed to accept her as a patient only if she would submit to whatever surgery was necessary. Tests were made, but their results were negative or inconclusive. Nonetheless, surgery was performed, a ruptured disc was found, and a cervical fusion was carried out.

The California Supreme Court reversed the commission's denial of reimbursement for these expenses under the statute. That Court stated:

"If an employer has refused an injured employee treatment for an industrial injury or claims that further care is unnecessary or futile, it is liable for the reasonable cost of medical care secured by the employee from a physician of his own choosing if such treatment is given within a reasonable time after the employer's refusal, if there has been no substantial change in the employee's condition before independent medical advice is rendered and if, at the time reimbursement is sought, the employee can show that the treatment he received was 'reasonably required to cure or relieve from the effects of the injury.' "[11]

There, as here, the employee gave no notice to the employer of an intention to obtain further treatment including surgery. There, as here, the giving of such notice would have been futile, for the employer in each case had already adopted the position that the employee's complaints were not genuine and had declined to supply further diagnostic aid. Thus, each employer declined to perform its mandatory statutory duty. There, as here, proper medical diagnosis ultimately showed that further aid was in fact required. No reason appears why claimant in this case should not recover the expenses of such aid just as the claimant in the McCoy case did.

The majority opinion in this case sanctions an extremely restrictive interpretation of a statute which imposes mandatory duties on an employer. Yet the cases are legion which hold that the workmen's compensation laws must be construed liberally.[12] For all of these reasons, I must dissent.

10. 64 Cal.2d 82, 48 Cal.Rptr. 858, 410 P. 2d 362 (1966).

11. Id. at 862, 410 P.2d at 366.

12. See, e.g., cases cited in Flock v. J. C. Palumbo Fruit Co., 63 Idaho 220, 242, 118 P.2d 707, 716 (1941) (footnote 3).