MICHAEL LELENKO *v.* WILSON H. LEE COMPANY ET AL.

MALTBIE, C. J., AVERY, BROWN, JENNINGS and ELLS, JS.

Argued December 3, 1941—decided January 14, 1942.

*William F. Healey,* for the appellants (defendants).

*Charles Henchel,* for the appellee (plaintiff).

MALTBIE, C. J.  The plaintiff is a linotype operator. After serving an apprenticeship, he had worked at his trade more than three and one-half years when he

entered the employ of the named defendant, hereafter referred to as the defendant. After working a few months, he developed, in July, 1939, a dermatitis. He continued his employment until October 26th following, but then became incapacitated and now claims workmen's compensation. The commissioner made an award in his favor; the defendant and his insurer appealed but the Superior Court dismissed the appeal; and from that judgment they have appealed to this court. The question is whether the dermatitis which caused the plaintiff's incapacity is an occupational disease which arose out of and in the course of his employment.

The commissioner made an extensive finding and the defendants sought numerous corrections in it. The Superior Court made two additions. The other corrections sought would not, except as hereafter noted, affect the result. We shall state such facts as are necessary to make clear the basis of our decision, incorporating one other correction justified by the evidence. After the plaintiff left his employment on October 26, 1939, he was in a hospital for two weeks and thereafter received medical treatment. On December 29, 1939, the dermatitis had cleared up. About two weeks later, seeking re-employment, he went to the defendant's plant, stayed in the shop fifteen to twenty minutes, and on the following day noticed a slight redness indicating a recurrence of the dermatitis. About a week and a half later he again returned to the plant and stayed over an hour, and the next day blisters appeared on the palms of his hands, a condition which shortly cleared up. He then secured in another plant the same kind of work he had been doing for the defendant, but the dermatitis returned and after three and one-half days he was forced to quit. Linotype machines require a melted lead alloy,

from which the type is made. At the defendant's plant pots electrically heated are used in connection with the machines to melt the metal. There is no apparatus for removing any fumes that may result. The pots are completely closed except where the metal is put in. The plaintiff had to open the one attached to his machine for this purpose, and at times when readjustment was necessary; and he also at times handled sticks of type which had not cooled.

After the first hearing before the commissioner, the plaintiff's physician, having learned that one of the elements in the lead alloy was antimony and knowing from medical literature that this metal had been found to cause dermatitis in certain workers when used in melting pots in printing establishments, tested the plaintiff twice by exposing his arm to the fumes of antimony melted in a test tube, and in both instances positive reactions occurred. At a further stage in the hearings it was agreed that as a test the plaintiff should return to work at the defendant's plant for a day and this he did. At the time he entered the plant he was found to have no evidence of any dermatitis, but there followed a recurrence of it in certain parts of his body. The commissioner concluded that it was reasonably probable that the dermatitis was due to fumes volatilized from the melting antimony and to the hot type he handled, and that the resulting incapacity arose out of and in the course of his employment. These were conclusions he could reasonably reach. It is true that the plaintiff's physician did not definitely state it as his opinion that fumes from the melting antimony did cause the dermatitis, but even in the absence of such testimony we cannot say that the commissioner could not reasonably conclude from the physician's testimony and the other facts before

him that it did. *Barry v. Miller,* 104 Conn. 362, 364, 133 Atl. 37.

It remains to consider whether the dermatitis was an occupational disease. Dermatitis of the kind from which the plaintiff suffered results from the sensitivity of an individual to a certain irritant, either solid, liquid or volatile; some people suffer from such an irritant following only a few contacts, while some acquire the disease after many years of contact; some irritants affect a much higher percentage of persons coming in contact with them than do others; and some are harmful only under certain circumstances. There had been no other case of dermatitis in the plant of the defendant, a large plant which had been operating many years; none of the physicians who testified had had any experience with dermatitis among linotypers, although some of them were specialists in this type of disease, and medical literature discloses few such cases. The dermatitis of the plaintiff was due to his individual susceptibility, to an unusual degree, to the fumes of the antimony. Our compensation act provides that the words "personal injury" or "injury" as used in it are to be construed to include occupational disease defined as follows: "a disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such." General Statutes, § 5223.

We have said: "This definition does not require that a disease, to be within the definition, should be one which arises solely out of the particular kind of employment in which the employee is engaged, nor that it should be due to causes in excess of the ordinary hazards of that particular kind of employment. Otherwise the definition would exclude most diseases; lead poisoning, for example, is not an ordinary incident of employment in general but arises

particularly out of those processes in which lead is used and occurs in a number of kinds of employment, but for that reason it is not to be held to be outside the definition. The phrase 'peculiar to the occupation' is not here used in the sense that the disease must be one which originates exclusively from the particular kind of employment in which the employee is engaged, but rather in the sense that the conditions of that employment must result in a hazard which distinguishes it in character from the general run of occupations; see Oxford Dictionary; Funk & Wagnalls Dictionary; and the phrase 'employment as such' means employment in general. To come within the definition an occupational disease must be a disease which is a natural incident of a particular occupation, and must attach to that occupation a hazard which distinguishes it from the usual run of occupations and is in excess of that attending employment in general." *Glodenis* v. *American Brass Co.*, 118 Conn. 29, 40, 170 Atl. 146. "This definition requires that, to constitute an occupational disease, the disease must be a natural incident of a particular kind of employment, one which is likely to result from that employment because of its inherent nature." *Madeo* v. *I. Dibner & Brother, Inc.*, 121 Conn. 664, 667, 186 Atl. 616.

In a number of decisions in other jurisdictions, an occupational disease is said to be one which results from the ordinary and generally recognized risks incident to a particular employment or which is a usual incident of such employment. See, for example, *Matter of Goldberg* v. *954 Marcy Corporation*, 276 N. Y. 313, 319, 12 N. E. (2d) 311; *Bollinger* v. *Wagaraw Building Supply Co.*, 122 N. J. L. 512, 515, 6 Atl. (2d) 396; *Victory Sparkler Co.* v. *Francks*, 147 Md. 368, 379, 128 Atl. 635; *Industrial Commission* v. *Roth*, 98 Ohio St. 34, 38, 120 N. E. 172; *Black* v. *Creston Auto Co.*,

225 Iowa 671, 676, 281 N. W. 189; *Cason* v. *American Brake Shoe & Foundry Co.,* 32 Fed. Sup. 680. The New York compensation law does not define occupational disease generally but gives a list of diseases incapacity from which is compensable and adds "any and all occupational diseases" contracted in employments covered by the law; it is said in the *Goldberg* case that the statute "has shown perhaps more clearly than by definition what is meant, by enumerating certain diseases" as compensable; and these are naturally diseases which have become generally recognized as likely to result from certain employments. Most of the other decisions which import this element into the definition were made in jurisdictions where occupational diseases are not within the compensation acts and the courts were concerned with the distinction between them and accidental injuries which were compensable or with the question whether an action at common law might be brought for incapacity resulting from the disease. Most of them also turned upon the fact that the risk which produced the incapacity was not a normal incident of the employment but one which arose out of unusual circumstances, as in the Ohio case, or was due to negligence on the part of the employer, as in the Maryland and Iowa cases.

We cannot import into the conception of occupational disease under our law the element that the disease must be a usual or generally recognized incident of the employment. Compensation under our law is not to be denied because the injury would not have occurred except for the peculiar susceptibility of the individual worker. *Santini* v. *Levin,* 110 Conn. 248, 253, 147 Atl. 680; *Richardson* v. *New Haven,* 114 Conn. 389, 392, 158 Atl. 886. Occupational diseases result ordinarily in incapacity in a relatively small proportion of the number of employees subjected to

the risk; indeed if this were not so, economic considerations would require an abandonment of the employment or a change in its conditions to obviate the risk. There is nothing in the terms of our statutory definition of an occupational disease which suggests that to fall within it a disease must be one which is a usual or generally recognized incident of the employment, and the considerations we have suggested preclude our finding that such a legislative intent is to be implied. A careful consideration of the question now before us negatives any inference to the contrary which might be drawn from our decisions in the *Glodenis* and *Madeo* cases. When we referred in them to disease as being a "natural" incident of the employment, we used that word in the sense that we have used it in defining proximate causation; *Santini* v. *Levin,* supra, 252; it imports not a forward look to determine what risks should have been foreseen, but a tracing back from the results to the circumstances out of which the disease sprang. *Reynolds* v. *Land Mortgage & Title Co.,* 114 Conn. 447, 455, 159 Atl. 282. If, so traced, a disease is the natural result of conditions which are inherent in the employment and which attach to that employment a risk of incurring it in excess of that attending employment in general, an award of compensation is not precluded because the risk is one which has not become generally recognized or because only employees unusually susceptible will suffer from the disease. Our conclusion is that the trial court was not in error in dismissing the appeal.

There is no error.

In this opinion the other judges concurred.