**TRAVELERS INS. CO. v. McKAIN et al.**
No. 13054.

United States Court of Appeals
Fifth Circuit.

Jan. 3, 1951.

274

A. J. Folley, Amarillo, Tex., for appellant.

F. H. McGregor, Jno. H. Merchant, Amarillo, Tex., for appellees.

Before HUTCHESON, Chief Judge, and McCORD and BORAH, Circuit Judges.

McCORD, Circuit Judge.

This suit was brought by Jocy B. McKain, widow of George E. McKain, joined by her three children, against The Travelers Insurance Company, a Connecticut corporation, to recover compensation under the amended Texas statute on account of the death of her husband. The complaint charges that George E. McKain contracted an occupational disease while he was employed as a guard at the United States Rubber Company synthetic rubber plant at Borger, Hutchinson County, Texas, during the period from October 1, 1947, to October 26, 1947, and that his death resulted on April 17, 1948. The suit was originally filed in the District Court of Hutchinson County, but was removed on motion of defendant to the United States District Court for the Northern District of Texas, where it was tried before a jury.

The principal questions presented are (1) whether there is substantial evidence to support the verdict returned by the jury in favor of plaintiffs; and (2) whether the trial court committed reversible error in overruling certain exceptions to its charge.

The important and material evidence, briefly summarized, reveals that the deceased, George E. McKain, was regularly employed as a guard in the synthetic rubber plant of the United States Rubber Company at Borger, Texas. The plant had been operated by the Goodrich Rubber Company prior to October 1, 1947, but was taken over on that date and operated there-

after by the United States Rubber Company for the United States Government, which owned the plant. In October, 1947, there were nine of these Government synthetic rubber plants in the United States. The Borger plant at that time employed 327 workers, 19 of whom were guards.

McKain worked under the supervision of a Sergeant of the guards, along with several other employees. His guard duties required him to check through the plant at certain intervals to enforce plant rules and regulations and see that certain precautionary and safety measures were observed. In connection with his duties, he was required to punch time clocks at specified plant locations and make periodic reports. There is evidence in the record that while thus employed he came into daily contact with and was frequently exposed to poisonous fumes and chemicals which had a toxic effect upon him; that these chemicals, particularly butadiene and styrene, had very distinctive odors which revealed their presence in the plant during the period in question; that they were regularly used in plants engaged in the manufacture and processing of synthetic rubber, and their use was essential and peculiar to such trade; that such chemicals are derivatives of benzol and are obtained from petroleum or its by-products, and are known to be poisonous to some individuals; that, as a result of his exposure to such poisonous chemicals and vapors, George E. McKain contracted a disease diagnosed as panhemotocytopenia,[1] which caused him to become totally incapacitated, and from which he finally died.

The plaintiff and widow of the deceased, Jocy B. McKain, testified that he had hardly ever been sick in his life, except for about two days, prior to his last illness; that he began to go down hill very rapidly during the month of October, 1947. Her evidence was corroborated by several other witnesses,[2] who worked as guards in

the rubber plant with McKain, and knew him intimately.

The Sergeant of the guards in the plant, Rutledge, testified that the deceased was one of the best guards he had, and that he never had to scold him about doing his job; that on one occasion McKain came and sat down in his office; that he appeared tired and listless, and acted like he didn't want to get up or move around, but that he had been such a good worker Rutledge said nothing to him about it; that McKain then told him his gums were bleeding and he advised McKain to see a doctor; and that McKain appeared to suffer an abrupt change of health only a short time before he was forced to quit work in late October of 1947. There is evidence to the effect that the deceased became weak and extremely pale, with a "yellowish cast" during this period.

There was further testimony by the plant guards to the effect that as a result of certain leaks and breaks in the pipes carrying the noxious chemicals through the plant during the month of October, 1947, McKain had been frequently exposed to fumes and vapors of butadiene and styrene. The chief chemist at the plant indicated that the presence of these chemicals could be easily detected because styrene has "a very distinctive odor", and butadiene "a very pungent odor, and evaporates very fast."

■ Appellant here attempts to attack the qualifications of plaintiffs' medical witness, Dr. George W. Dorman, without specifically assigning error in that regard. In this connection, it was shown that Dr. Dorman was a graduate physician and a regularly licensed doctor and surgeon in the state of Texas. He had been a Navy doctor during the war, and the Government had given him a year of training in clinical pathology and bacteriology at the Veterans Administration Hospital in Dallas, Texas. He had been the pathologist at the Veterans Administration Hospital in Am-

---

1. According to the medical testimony, panhemotocytopenia is a disease of the "blood dyscrasia group", and is caused from a lack of production or existence of all solid or cellular elements of the blood produced by the marrow of the bone.

2. These witnesses were W. E. Gregg; Jim Williams, Bert Bryan, and H. S. Rexroad.

arillo, Texas, and in charge of the hospital laboratory, at the time McKain was hospitalized there, and during his illness. We believe his qualifications as an expert medical witness were clearly shown.

Dr. Dorman testified that while George McKain was in the Amarillo Hospital for diagnosis and treatment he made certain laboratory tests in an effort to determine the nature of his ailment; that he personally extracted a specimen from the marrow of McKain's sternum or breastbone which he spread in parafin on a microscopic slide and stained for microscopic examination; that his examination of this specimen under the microscope showed a decreasing number of blood cellular forming elements normally present in the bone marrow and a lack of normal production of these blood-forming elements; that he did not form any definite opinion as to the true cause of McKain's illness at that time, but had another specimen extracted from the cavity of McKain's ilium or pelvis and examined it under the microscope. On this point he further testified:

Q. "Is the taking of a specimen, such as you have described, of the ilium, an ordinary procedure to obtain the information necessary to make a diagnosis?

A. "This procedure is commonly employed after first attempting to make a diagnosis from the more simple sternal marrow aspiration, and is used to obtain the entire marrow section as it lies intact in the living body.

Q. "Did you, at any time following your examination of the bone taken from the ilium, form an opinion as to what was wrong with George McKain?

\* \* \* \* \* \*

A. "My opinion, after examining the ilium biopsia, was that Mr. McKain was suffering from a disease known as panhemotocytopenia, which means a lack of production or existence of all solid or cellular elements of the blood which are produced in the bone marrow, or by the bone marrow."

Dr. Dorman personally performed an autopsy on the body of George McKain after his death. The autopsy disclosed that the primary cause of his death was pulmonary edema, the secondary effect of panhemotocytopenia; this phrase is used to describe a leaking of the fluids into the air-containing portions of the lungs, and when it occurs the patient literally drowns in his own fluids.[3]

3. The following record testimony is highly pertinent on the cause of McKain's illness, and the question of whether it constituted an occupational disease:

(Dr. Dorman)

"Q. Were you informed that he (McKain) was working in a rubber plant where synthetic rubber was being made from petroleum products? A. Yes.

"Q. While Mr. McKain was a patient at the hospital, did you give him any instructions as to whether or not he should go back over around the rubber plant? \* \* \* A. I personally did not.

\* \* \* \* \* \*

"Q. Did you make some statement in connection to his going back around the rubber plant to any member of Mr. McKain's family? A. Yes, I told Mrs. McKain.

"Q. Go ahead and answer the question. A. I did tell Mrs. McKain that under the circumstances of Mr. McKain's illness that it was highly probable that his disease was a result of an industrial poisoning, and that he therefore should not return to the same environment after leaving the hospital, the reason being that the same environment could and most likely would jeopardize his health.

"Q. Doctor, did you form an opinion that from your examination and history, as taken from Mr. McKain, that Mr. McKain's working around a synthetic rubber plant where synthetic rubber was being manufactured from petroleum products was the cause of his illness? I just asked you whether you had formed an opinion of that, Doctor, and your answer should be 'yes' or 'no'. A. Yes.

"Q. What was that opinion, Doctor? A. It was my opinion, after evaluating the history as taken by the hospital staff, that there was no definite etiological agent in evidence which could be definitely, without any doubt, pointed out as the cause of Mr. McKain's illness, and under the circumstances it was my opinion that the most likely cause of his illness, let's change that a little bit—it is my opinion that his illness was most likely caused by hemorrhage of an agent

The record contains a stipulation between the parties to the effect that styrene and butadiene are petroleum by-products, and that, in the event of recovery, plaintiff was earning enough to warrant the twenty-five dollar maximum weekly compensation rate allowed by the statute. Accordingly, after the jury had returned a general verdict for plaintiffs, the trial court rendered judgment in their favor for the sum of $8,375.00, which amount represented compensation at the agreed rate of $25.00 per week for the period of 360 weeks allowed, less compensation for the time deceased lived after he contracted his occupational disease. Motion for judgment notwithstanding the verdict, and in the alternative, for a new trial, was thereafter overruled.

■ We have examined a host of decisions to the effect that the Texas Compensation Statute should be liberally construed in favor of the employee, and that doubts encountered in an effort to arrive at a reasonable and fair construction should generally be resolved in favor of effecting that broad coverage for which the statute was originally enacted. See Winder v. Consolidated Underwriters, 5 Cir., 107 F. 2d 973; Security Mutual Cas. Co. v. Wakefield, 5 Cir., 108 F.2d 273; Casualty Reciprocal Exch. v. Johnson, 5 Cir., 148 F.2d 228; Pacific Emp. Ins. Co. v. Gage, Tex. Civ.App., 199 S.W.2d 537; American Mut. Liab. Ins. Co v. Parker, 144 Tex. 453, 191 S.W.2d 844; Huffman v. Southern Underwriters, 133 Tex. 354, 128 S.W.2d 4; Texas Employers Ins. Ass'n v. Andrews, 130 Tex. 502, 110 S.W.2d 49. Moreover, Section 20 of the amended statute here under consideration specifically defines and includes poisoning by petroleum or petroleum products as an "occupational disease".[4] Section 20 of Article 8306, Vernon's Annotated Civil Statutes of Texas; see also, LeLenko v. Wilson H. Lee Co., 128 Conn. 499, 24 A.2d 253; Arkansas National Bank v. Colbert, 209 Ark. 1070, 193 S.W.2d 806; Lamar Bath House v. McCloud, 209 Ark. 1078, 193 S.W.2d 809.

■ From a careful consideration of the entire record we conclude there is substantial evidence to support the verdict and justify a recovery in this case. Massachusetts Bonding & Ins. Co. v. Massey, 5 Cir., 123 F.2d 447; Brodtmann v. Zurich Gen. Acc. & Liab. Ins. Co., 5 Cir., 90 F.2d 1; Lowrie v. American Surety Co., 5 Cir., 146 F.2d 33; Travelers Ins. Co. v. Price, 5 Cir., 111 F.2d 776. The fact that there was other conflicting testimony by appellant's own medical experts as to the possible cause of McKain's death in no wise disproves Dr. Dorman's qualifications or discredits his testimony, but merely raised factual issues which have been resolved by the jury. Cf. Associated Employers Lloyds v. Self, Tex.Civ.App., 192 S.W.2d 902; Texas Life Ins. Co. v. Hatch, Tex.Civ. App., 167 S.W.2d 802; American Nat. Ins. Co. v. Ferguson, Tex.Civ.App., 209 S.W.2d 797. Furthermore, after plaintiffs had sustained their burden of proving that an occupational disease was the most probable cause of McKain's death, they were not bound to exclude by their testimony every other possible cause. Travelers Ins. Co. v. Warrick, 5 Cir., 172 F.2d 516; see also, Watson's Case, 322 Mass. 581, 78 N.E.2d 633; Flynn v. Growers Outlet, Inc., 307 Mass. 373, 30 N.E.2d 250.

We have carefully examined each and every specification of error relied upon by appellant, and find all of them without

---

toxic to Mr. McKain, which would cause depression of the bone marrow function. Should I give an opinion as to the usual thing?

"Q. Well, petroleum and petroleum by-products are agents that can and do cause, from your experience, the condition that you found in Mr. McKain? A. It is known by medical authority that chemicals obtained from crude petroleum can be toxic to some individuals in this manner."

4. That Section, insofar as is here material, reads as follows:
"Unless from the context the meaning is clearly to the contrary, such terms (injury or personal injury) shall also be construed to mean and include occupational diseases, as hereinafter defined. The following diseases only shall be deemed to be occupational diseases:
"(a) Poisoning by: * * * (23) Petroleum or Petroleum Products."

merit. The charge of the trial court was clear and concise, and substantially preserved the crux of the case for the consideration of the jury. We further find no error in the overruling of the motion for a new trial. Hunter v. Derby Foods, 2 Cir., 110 F.2d 970, 133 A.L.R. 255; U. S. v. Barnette, 5 Cir., 91 F.2d 10; MacGregor v. State Mut. Life Assur. Co., 315 U.S. 280, 62 S.Ct. 607, 86 L.Ed. 864; Northern Liquid Gas Co. v. Hildreth, 8 Cir., 180 F.2d 330.

We find no reversible error in the record, and the judgment is accordingly

Affirmed.