581 P.2d 770

Delos L. BOWMAN, Claimant-Appellant,

v.

TWIN FALLS CONSTRUCTION
COMPANY, INC., Employer,

and

General Insurance Company of America,
Surety, Defendants-Respondents.

No. 12177.

Supreme Court of Idaho.

June 21, 1978.

S. A. Kolman, Jerome and Wendell, for claimant-appellant.

Peter J. Boyd and Phillip M. Barber of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for surety, defendants-respondents.

BISTLINE, Justice.

Delos L. Bowman, found to be permanently and totally disabled, appeals from the Commission's denial of any benefits. Bowman was a heavy equipment operator, primarily engaged in road construction, from 1936 to 1974, the last 18 years with Twin Falls Construction Company, which employer and General Insurance Company, its surety, are defendants. On August 12, 1974, at the age of 62, he was forced to stop working because of extreme shortness of breath. He was diagnosed as having moderate to severe pulmonary emphysema with secondary congestive heart failure. That he is permanently and totally disabled is not in dispute; the Commission so found. The Commission also found, however, that Bowman's occupation was not a major contributing factor to his pulmonary disease, and that the disease was not contracted or incurred during his employment and was not due to the nature of his occupation as being characteristic of and peculiar to his work as a blade operator, cat skinner and operator of a rock crusher. The Commission, in denying Bowman's claim, concluded as a matter of law that:

The Claimant's total and permanent disability may not be apportioned among contributing causes (Section 72–406, Idaho Code).

The Commission did not further elucidate as to the factors which brought it to that conclusion.

I.

The employer and surety urge that the conclusion followed from the reluctance of the doctors to place a numerical value on the various causes contributing to Bowman's disease, leaving the Commission with no competent medical evidence on which to base an apportionment. Quoting from respondents' brief:

This section [I.C. § 72–406] has been cited by the Supreme Court with approval in *Scott v. Aslett Constr. Co.*, 92 Idaho 834, 452 P.2d 61. The Court held it was for the Commission to determine if there was competent and substantial evidence on which it could make an apportionment between a pre-existing condition which resulted in disability and the disability from injury or disease for which claimant seeks compensation. *In the instant case the Commission felt there was not substantial and competent medical evidence which would permit them to apportion.* This finding, though there is conflicting evidence, i. e., Dr. Cutler, should be binding and not overturned on appeal. (Emphasis added.)

Respondent's reliance upon *Scott v. Aslett, supra,* is misplaced. For one thing, *Scott v. Aslett* can not stand as an authoritative interpretation of I.C. § 72–406 because the present version of that statute did not become effective until January 1, 1972—more than three years *after Scott v. Aslett* was decided. Secondly, *Scott* itself is far removed from the facts of this case and, moreover, involved a situation where the Commission *did* apportion 40% to the claimant's pre-existing condition of osteoarthritis and granted 60% recovery for injuries sustained in a fall from a caterpillar tractor. Finally, respondent misses the holding in *Scott.* That case deferred in turn to the

earlier case of *Wilson v. Gardner Associated, Inc.*, 91 Idaho 496, 426 P.2d 567 (1967), where, according to the *Scott* Court, we had made our most "exhaustive review of Idaho's legislative history and case law" on the question of apportionment and had concluded as follows:

> The further rule which emerges particularly from the *Wilson v. Gardner* case is that, "By I.C. § 72–323 the board is authorized *and required* to apportion the degree and duration of disability between the injury resulting from the accident and that resulting from any preexisting injury or infirmity." (Emphasis added.)

*Scott v. Aslett Constr. Co.*, 92 Idaho at 841, 452 P.2d at 68. *See also Zipse v. Schmidt Bros.*, 66 Idaho 30, 154 P.2d 171 (1944).

The statute governing apportionment between a pre-existing condition and an *accident* which was in effect at the time of the *Scott* and *Wilson* cases, was ch. 155, § 1, 1941 Idaho Sess. Laws 310 (as noted above, this was later codified as I.C. § 72–323):

> If the degree or duration of disability resulting from an accident is increased or prolonged because of a preexisting injury or infirmity the employer shall be liable only for the additional disability resulting from such accident.

In language even more squarely on point for the present case, another statute in effect at *that* time also provided for apportionment between a pre-existing infirmity and an aggravating *occupational disease*:

> [W]here an occupational disease is aggravated by any other disease or infirmity, not itself compensable, *or where disability or death from any other cause, not itself compensable, is aggravated, prolonged, accelerated, or in any wise contributed to by an occupational disease*, the compensation payable shall be reduced and limited to such proportion only of the compensation that would be payable if the occupational disease were the sole cause of the disability or death as such occupational disease, as a causative factor, bears to all the causes of such disability or death. (Emphasis added.)

Ch. 161, § 2, 1939 Idaho Sess. Laws 286 (later codified as I.C. § 72–1208). Under either of those earlier statutes, therefore, the Commission had the obligation to apportion the injury or occupational disease among its contributing causative factors and to award benefits, regardless of how small the resulting percentages might be. *See*, for example, the second *Dean* case, *Dean v. Dravo Corp.*, 97 Idaho 158, 540 P.2d 1337 (1975), in which the Commission apportioned ⅔ of 5% of a permanent partial disability to work-related causes and awarded benefits accordingly. We are cited to and can find no precedent for the procedure followed by the Commission in this case where it held that a worker's disability ·is "the result of many factors, *including . . . working conditions*," but then denied benefits because the "working conditions" were only a "slight" rather than a "major" aggravating ·cause.

█ It seems more likely, therefore, that the Commission's conclusion that claimant's "disability may not be apportioned among contributing causes" and its enigmatic reference to I.C. § 72–406 is a reference not to the difficulty or impossibility of making an apportionment, but rather to what the Commission considers to be a lack of statutory authority for making an apportionment under the facts of this case, where it is undisputed that claimant's disability is *not* "less than total," and is permanent as well. The controlling statute, I.C. § 72–406, was enacted as part of the comprehensive revision in 1971 but has not been authoritatively construed by this Court prior to today. In relevant part, it reads as follows:

> *Deductions for preexisting injuries and infirmities.*—(1) In cases of permanent disability less than total, if the degree or duration of disability resulting from an industrial injury or occupational disease is increased or prolonged because of a preexisting physical impairment, the employer shall be liable only for the additional disability from the industrial injury or occupational disease.

This is the key language: "In cases of permanent disability *less than total.*" Here the Commission found claimant totally and

permanently disabled. The Commission was therefore correct in concluding that the 1971 statute differed from those it replaced by not providing for apportionment among causative factors in a *total* and permanent disability case. It does not follow from this conclusion, however, that the Commission was required to deny benefits entirely. On the contrary, having found that Bowman's "working conditions" contributed, even slightly, to a disability which is total and permanent, such permanent and total disability is fully compensable. The entire compensation, however, is not chargeable to the employer and his surety. I.C. § 72–332, which was enacted in 1971 at the same time that I.C. § 72–406 was enacted and apparently in conjunction therewith, provides in part:

If an employee who has a permanent physical impairment from any cause or origin, incurs a subsequent disability by an injury or occupational disease arising out of and in the course of his employment, and by reason of the combined effects of both the preexisting impairment and the subsequent injury or occupational disease or by reason of the aggravation and acceleration of the preexisting impairment suffers total and permanent disability, the employer and surety shall be liable for payment of compensation benefits only for the disability caused by the injury or occupational disease, including scheduled and unscheduled permanent disabilities, and the injured employee shall be compensated for the remainder of his compensation benefits out of the special industrial indemnity fund.

There is much to recommend the present statutory policy, which is but a return to the law of Idaho as of earlier days:

"Where injury results partly from accident and partly from pre-existing disease, it is compensable if the accident hastened or accelerated the ultimate result, and it is immaterial that the claimant would, even if the accident had not occurred, have become totally disabled by the disease."

*Hamlin v. University of Idaho*, 61 Idaho 570, 576, 104 P.2d 625, 627 (1940). The reason why a total and permanent disability is fully compensable, even though resulting partly from a pre-existing condition, was well expressed by the Supreme Court of Michigan in a most thoroughly considered case:

Nothing is better settled in compensation law than that the act takes the workmen as they arrive at the plant gate. Some are weak and some are strong. Some, particularly as age advances, have a preexisting "disease or condition" and some have not. No matter. All must work. They share equally the hazards of the press and their families the stringencies of want, and they all, in our opinion, share equally in the protection of the act in the event of accident, regardless of their prior condition of health.

*Sheppard v. Michigan National Bank*, 348 Mich. 577, 83 N.W.2d 614, 616 (1957). Idaho long adhered to a similar rule. *Laird v. State Highway Dept.*, 80 Idaho 12, 323 P.2d 1079 (1958); *Teater v. Dairymen's Cooperative Creamery*, 68 Idaho 152, 190 P.2d 687 (1948); *Nistad v. Winton Lumber Co.*, 61 Idaho 1, 99 P.2d 52 (1940); *In re Larson*, 48 Idaho 136, 279 P. 1087 (1929).

Bowman became totally and permanently disabled because his work environment aggravated or accelerated a pre-existing disease or condition. This disability at age 62, according to Dr. Smith, occurred 10 to 15 years earlier than would otherwise have been the case due to natural factors. Dr. Smith compared Bowman's situation to that of a worker suffering from a hernia injury:

There is certainly no way to differentiate how much of the pre-existing [condition of abdominal wall weakness] . . . contributed to his hernia. In this view, then, the patient appears to be needing and deserving 100% disability secondary to long-term exposure to a dusty environment.

The same analogy was approved by this Court in the case of *Beaver v. Morrison-Knudson Co.*, 55 Idaho 275, 41 P.2d 605 (1934), where we analogized tuberculosis to

a tire blowout resulting from gradual wear and tear, or to a rupture which disables at a given time but is due to years of overstraining oneself. The principle is the same in each case:

"If there is a pre-existing disease, the employee is entitled to recover for all the consequences attributable to the injury in the *acceleration* or *aggravation* of such disease. Such *aggravation* or *acceleration, permanent and progressive in its nature,* will entitle the employee to compensation to the extent and in proportion in which the pre-existing disease is increased or aggravated. Mere predisposing physical condition does not affect the right to compensation." (Italics added in the *Beaver* opinion.)

55 Idaho at 296, 41 P.2d at 613 (quoting from *Hanson v. Independent School District 11–J,* 50 Idaho 81, 85, 294 P. 513 (1930).)

■■ Nor is the Commission required to seek out a distinction between those work-related contributing factors which are "major" and those which are "slight." When one's employment aggravates, accelerates or "lights up" a pre-existing disease so that total permanent disability results, the employee is entitled by statute to 100% disability benefits. He is 100%, i. e., "totally" disabled from working; his disability is permanent. The Commission here did indulge in such a distinction, saying that "the inhalation of dust during the claimant's employment aggravated his pulmonary disease to a *slight* extent," but that "it was not the underlying cause of the disease or a *major* aggravating factor." The language of *Beaver* is applicable: "mere predisposing physical condition does not affect the right to compensation." It does not make any difference that the inhalation of dust during employment is a slight rather than a major contributing cause of *resultant total disability.*

## II.

One of Bowman's challenges is to the Commission finding regarding the extent to which his total disability may be attributed to occupational factors. Bowman argues that the Commission finding that "occupational factors have contributed only slightly to the claimant's present total disability" is based upon an application of an improper standard of proof, i. e., that Bowman was required to establish his medical proof to a standard of "medical certainty" rather than to a standard of "medical probability."

At the hearing, counsel for claimant put this crucial question to Dr. Smith, the sole medical witness who appeared in person:

Q. Is it then your present professional medical opinion, based upon a reasonable degree of medical probability, that Mr. Bowman's condition was aggravated by virtue of the particular work that he did for Twin Falls Construction Company?

At that point, one of the Commissioners interposed:

[COMMISSIONER]: Just a minute. I'm sorry to have to interrupt, Mr. Chairman. The test is reasonable degree of medical certainty, not medical probability. Now, I say that to protect this record because I can see you have a serious case here. So, you rephrase that question, a reasonable degree of medical certainty, not probability.

Throughout the remainder of the hearing, all questions put to Dr. Smith were required to be phrased in terms of "medical certainty." The same format was followed in a later deposition of Dr. Nowierski.

The question of what standard the Commission must apply in dealing with medical testimony has been before this Court several times in recent years. In *Dean v. Dravo Corporation,* 95 Idaho 558, 511 P.2d 1334 (1973), we concluded:

In order to recover in Workmen's Compensation cases there must be medical testimony supporting the claim for compensation with a reasonable degree of medical probability.

95 Idaho at 560–61, 511 P.2d at 1336. In that case, we defined "probable" as " 'having more evidence for than against'." So understood, "probability" is distinguished from and represents a higher standard than

mere "possibility," "speculation" or "conjecture." *Dean v. Dravo Corp.*, 97 Idaho 158, 540 P.2d 1337 (1975); *Bills v. Rich Motor Co., Inc.*, 96 Idaho 259, 526 P.2d 1095 (1974); *Fisher v. Bunker Hill Co.*, 96 Idaho 341, 528 P.2d 903 (1974).

 Our opinions thus make it clear that a "reasonable degree of medical probability" is the proper test. To require "certainty," when causation itself is today defined in terms of statistical "probability," is to ask for too much. As our first *Dean* opinion made clear, one cannot expect the claimant to prove that his occupation *necessarily* caused his disabling condition. *Dean v. Dravo Corporation, supra,* 95 Idaho at 562, 511 P.2d 1334. The Supreme Court of California, faced with a similar problem has reached much the same conclusion:

> The exact amount and kinds of pollutants inhaled by decedent [a fireman who died of lung cancer] could only be known if a chemist had gone with him to each fire over his 32 years as a fireman. The precise toxicity of each type of pollutant, alone or in combination with others, is still not known.
>
> In order to cover such unavoidable uncertainties, we require applicants to establish no more than that industrial causation is reasonably probable.
>
> . . . . .
>
> Future scientific developments will tell us more about lung cancer. Ultimately it may be possible to pinpoint with certainty the cause of each case of the disease. But the Legislature did not contemplate years of *damnum absque injuria* pending such scientific certainty.

*McAllister v. Workmen's Compensation Appeals Board,* 69 Cal.2d 408, 417–18, 71 Cal. Rptr. 697, 702–03, 445 P.2d 313, 318–19 (1968).

Respondent surety argues that the Commission's distinction between "certainty" and "probability" was intended to correspond to this Court's own distinction between "probability" and mere "possibility," and that in any case, the Commission's insistence upon "a reasonable degree of medical certainty" was harmless error since it

did not appear to hinder the witness nor reduce him to silence.

Our concern, however, is not only with the standard exacted of the medical witnesses but also with that applied by the Commission itself in making its own findings. These findings of causation, denominated as "slight," are such as to suggest that the Commission itself was looking for a causation proved to a medical certainty. On the causation issue, the Commission had before it the live testimony of one doctor and the deposition testimony of two others.

Dr. Cutler, of the Rumel Chest Clinic in Salt Lake City, treated Mr. Bowman for the two weeks the claimant was hospitalized there in August of 1974 as well as on several other occasions. The Commission summarized its view of Dr. Cutler's deposition testimony as follows:

> In Dr. Cutler's opinion, the claimant's lung condition was due to many factors, including constitutional or inherited factors such as allergic reactions, which Dr. Cutler considered the most important cause, personal habits such as smoking, and, to a lesser extent, occupational factors.

In an exhibit before the Commission, however, Dr. Cutler stated:

> I feel there can be no question but what the heavy atmospheric particulate in which this man has labored over the years has certainly served as an aggravating factor but probably only equally so along with other factors that must be considered.

When asked to put a number on the extent to which Bowman's condition was "caused or aggravated by his employment," Dr. Cutler replied:

> I certainly think his condition was aggravated, but it was not the total single cause of his condition, but it certainly, I think, was a significant contributing factor, probably to the extent [of] twenty-five per cent.

Dr. Smith testified before the Commission. A pulmonary specialist in charge of the tuberculosis outpatient clinic for south

central Idaho, he examined Bowman in March of 1975, performed a chemistry screen on him and took x-rays which were read in consultation with a radiologist. The Commission summarized its view of his testimony:

> Dr. Smith could not determine the extent to which the claimant's condition resulted from his work environment. It was his opinion that the condition resulted from constitutional and inherited factors and the claimant's history of smoking, with the condition aggravated to some extent by breathing dust during the course of his employment.

While it is true that Dr. Smith, too, declined to state a fixed number as to the percent of Bowman's condition attributable to his occupation, yet in another exhibit before the Commission, in language similar to that used by the California Supreme Court in *McAllister*, Dr. Smith wrote:

> the patient's long-term exposure to the particulate matter involved in the construction job has caused aggravated injury to his lungs that we now see as chronic obstructive pulmonary disease. He is 100% disabled according to all disability tables and hence I see no way to distinguish how much of the long-term exposure to the dusty environment contributed to his disability and one must take this at 100%.

Counsel for the surety in his brief candidly recognized the validity and weight of Dr. Smith's testimony:

> Dr. Smith testified in great detail that claimant's condition was aggravated and contributed to by his inhalation of particulates in the course of his employment. His testimony was thorough and conclusive that claimant's condition was aggravated by working outdoor in all types of particulate.

Dr. Nowierski examined Bowman at the surety's request. Other than a partial set of x-rays he had taken, he relied almost exclusively on Dr. Cutler's records. The Commission summarized his deposition testimony in this manner:

> congestive heart failure was the most significant factor in the claimant's disability. In the doctor's opinion the claimant's condition was not the result of occupational factors, and any relationship to the inhalation of dust while working was limited to slight aggravation, if any, of the claimant's lung disorder.

The Commission finding above set forth was its analysis of Dr. Nowierski's conclusions almost verbatim. Counsel for claimant on his examination of Dr. Nowierski listed the factors which had been listed by Dr. Cutler—namely, "constitutional factors, hereditary factors, social factors peculiar to the particular person, *and this exposure to these particulates*"—and then asked Dr. Nowierski: "Would it be safe to say then that your medical opinion would be the same as Doctor Cutler's and Doctor Smith's, that these are well-defined causes for pulmonary problems?" Dr. Nowierski replied in the affirmative.

■ We conclude, then, that the Commission in making its evaluation of the causes of claimant's total and permanent disability was applying the same standard of "medical certainty" which it required counsel to use in phrasing questions. An ultimate finding based upon an improper application of law to the facts can not stand. Bowman *is* totally disabled due to pulmonary disease. On remand the Commission is thus directed to redetermine the extent to which his total disability, when judged by a standard of "medical probability," has been contributed to and aggravated by working conditions during his 18 years of employment by respondent employer—the proportion of total disability attributable to employment to be set in percentages in order that the apportionment may be made between the respondent surety and the state industrial special indemnity fund.

Testimony in that regard, to a "medical probability," can be received in such manner as to which the parties may agree, or as the Commission may direct, and the apportionment by the Commission required by I.C. § 72–332 can be determined, also to a medical probability. As was stated in *Bea-*

ver over 50 years ago, "There are very few absolute certainties in damage litigation," 55 Idaho at 297, 41 P.2d at 614. In *Gjerning v. Potlatch Forest, Inc.*, 91 Idaho 15, 16, 415 P.2d 301, 302 (1966), we reiterated the theme: " 'Here as elsewhere, the law contents itself with probabilities, and declines to wait for certainty before drawing its conclusions.' " (Quoting from *Lewis v. Ocean Accident & Guarantee Corp.*, 224 N.Y. 18, 120 N.E. 56, 7 A.L.R. 1129, 1131 (1918), per Justice Cardozo.)

### III.

The Commission's disposition of Bowman's claim also concluded:

> that the claimant's pulmonary disease was not contracted or incurred during his employment with the defendant employer . . . [and] is not due to the nature of his occupation, nor is it characteristic of and peculiar to his occupation as a heavy equipment operator in road construction work.

These conclusions appear to be designed to track the statutory language of I.C. § 72–102(17)(a) and (b), which are also a part of the substantial revision of the Workmen's Compensation Law enacted in 1971:

> (17) "Occupational diseases."
>
> (a) "Occupational disease" means a disease due to the nature of an employment in which the hazards of such disease actually exist, are characteristic of, and peculiar to the trade, occupation, process, or employment.

> (b) "Contracted" and "incurred," when referring to an occupational disease, shall be deemed the equivalent of the term "arising out of and in the course of" employment.

These recent statutory requirements are best understood against the background of Idaho's occupational disease law. Idaho was one of the first states to construe its workmen's compensation law so as to provide relief for work-related disabilities which occur gradually rather than at a specific point in time and place. As mentioned above, the landmark case was *Beaver v. Morrison-Knudsen Co.*, 55 Idaho 275, 41 P.2d 605 (1934). The facts were not unlike the present case. The claimant there suffered from a pre-existing tubercular condition (as well as from cancer of the neck) but claimed that his work on the M–K rock crusher and hot plant caused "a series of irritations which lighted up his latent" condition and resulted in acute tuberculosis and eventually his death. The Industrial Accident Board, as here, denied his claim on the grounds that it was a mere recurrence of a pre-existing condition, had not arisen out of and in the course of his employment and was not connected with his particular occupation.

This Court reversed the Board initially because "there was not sufficient, competent and substantial evidence to support the board's findings." 55 Idaho at 291, 41 P.2d at 611.[1] A rehearing was granted so as to

---

1. Attention is directed to the precise standard of review enunciated in the text. The *Beaver* court, by applying the quoted standard, did not, as we today do not, "enter the fact-finding process." Justice Bakes' assertion to the contrary is based upon his contention that the *Beaver* decision

> Pioneered a constitutional amendment to Art. 5, § 9, of the Idaho Constitution which limited the jurisdiction of the Supreme Court "on appeal from orders of the Industrial Accident Board . . . to a review of questions of law."

The assertion is undocumented and my own research has unearthed no evidence to show that the constitutional amendment which was approved by the voters on November 3, 1936, had, as its purpose, to chastise the Idaho Supreme Court for its handling of the *Beaver*

case. So far as I can determine, the purpose of the 1936 amendment was to provide for *direct* Supreme Court review of Industrial Accident Board decisions rather than going through the district court, as had occurred in *Beaver* and at all times since the Industrial Accident Law was passed.

While it is true that the amendment limited the Supreme Court to reviewing questions of law, it merely "constitutionalized" what had always been the Court's own understanding of its proper role. In *McNeil v. Panhandle Lumber Co.*, 34 Idaho 773, 203 P. 1068 (1921), the very first case in which the Supreme Court had to address board findings under the then infant Workmen's Compensation Act, the Court (in the succinct summary of the editor's headnote) adopted the following standard of review:

address the Board's alternative conclusion that the tuberculosis, even if it *was* caused by the employment, was not, as a matter of law, an "accident." (Workmen's Compensation Law at that time made no provision for "occupational diseases.") The employer and its surety argued that since the claimant had worked at M–K for nearly four years it was impossible to pinpoint the time when the "accident" occurred. To the question, "When did the injury or 'accident,' if such occur?", Justice Ailshie replied:

> It does not seem to us that it makes any legal or rational difference as to which way this question is answered. The cause and result are both definite and certain. . . . *He could not anticipate or foresee the result, neither could his employer.* Now who can in truth and fairness say this was not a compensable "accident"? (Emphasis in original.)

*Id.* at 294–95, 41 P.2d at 613. The Court also said:

> As to the *cause* of the injury, it seems clear from the evidence that the inhalation of silica dust while working for the Morrison-Knudsen Company from 1928 to October, 1931, revived a latent tuberculosis condition in the employee's lungs, which in 1931 suddenly "lightened up," or as the physician says, "blew up, all to pieces at once," some time between February and October, 1931, and resulted in his death.
>
> Now this brings us to the practical and crucial inquiry: When did the injury or "accident," if such occur?

. . . . .

We are not unmindful of the fact that the words "injury" and "accident" are not synonymous terms as used in the statute under consideration. The facts of this case require a recognition of the distinction in meaning of these two terms. In the circumstances confronting us here, it is not thought essential to a decision of the case that the court assert or attempt to decide just when and where the injury and result both merged into a consummated "accident." (Emphasis in original.)

*Id.* Idaho was thus among the states to pioneer in awarding relief for workers afflicted by an occupational disease. The rationale was that the disease was an "accident." To the objection that an accident connoted a particular, identifiable event in place and time, the Court replied that the requirement could be met either by considering the entire series of irritations to be a series of mini-"accidents" or by considering the "accident" to occur on the day when the disability became so pronounced as to force the worker to retire. As shown earlier on in this opinion, Idaho was likewise one of the first states to hold that an aggravation or acceleration (a "lighting up") of a pre-existing disease was itself a compensable disability. The Idaho doctrines were relied upon by other jurisdictions in forming their own law in the field. *See*, for example, *Batesville White Lime Co. v. Bell*, 212 Ark. 23, 205 S.W.2d 31 (1947); *Stevenson v. Lee Moor Contracting Co.*, 45 N.M.

---

The findings of fact of the industrial accident board, when supported by competent evidence, are conclusive on appeal to the district court or to this court, the jurisdiction of said courts being limited to a review of questions of law.

34 Idaho at 773, 203 P. at 1068. The Court, to my knowledge, has never wavered from this standard and the 1936 amendment did nothing to change it.

On the other hand, the Court has never hesitated—before or after the constitutional amendment of 1936—to shoulder its responsibility of determining whether Industrial Commission findings of fact are supported by substantial competent evidence. *That determination is a question of law, not one of fact:*

Findings of the Industrial Accident Board, when supported by substantial, competent evidence will not be disturbed on appeal. [Citations omitted.] Conversely, when the findings are not supported by substantial, competent evidence, they are not binding or conclusive, and upon appeal will be set aside. *Whether such findings are supported by substantial, competent evidence is a question of law to be determined by the court.* (Emphasis added.)

*Paull v. Preston Theatres Corp.*, 63 Idaho 594, 600, 124 P.2d 562, 564 (1942). *See also* the cases cited in the footnote accompanying the above text.

354, 115 P.2d 342 (1941); *In re Pero*, 49 Wyo. 131, 52 P.2d 690 (1935).

In 1939, the Workmen's Compensation Law was revised so as to make express provision for a list of specific occupational diseases. The following year, this Court had its first opportunity to construe the new statute and declared that the revision was "supplementary to the industrial workmen's compensation law and hence likewise to be liberally construed." *Goaslind v. City of Pocatello*, 61 Idaho 435, 438, 102 P.2d 650, 651 (1940). Henceforth it became unnecessary to strain the word "accident" to cover what were actually diseases. "Accident" was defined as something "happening suddenly . . . and which can be definitely located as to time and place where it occurred." The intent was obviously to divide the field of compensable disabilities between those happening suddenly ("accidents") and those contracted over many years of work ("occupational diseases"). Unfortunately, it became possible to fall between the two tables: if one's condition had not been contracted "suddenly," it was not an "accident," but yet, if it was not on the specific list, it would not be an "occupational disease." *See*, for example, *Welch v. Safeway Stores, Inc.*, 87 Idaho 396, 393 P.2d 594 (1964).

The 1971 legislative comprehensive revision of the workmen's compensation law brought about two changes which are relevant to our inquiry. In the first place, the requirement of suddenness was dropped from the definition of the word "accident." Second, a paragraph was added to the list of specific occupational diseases to make it clear that "[t]he above enumerated occupational diseases are not to be taken as exclusive." I.C. § 72–438.[2] Thus, it would appear possible for claimant here to argue that his condition is *both* an "accident" (because of this Court's traditionally expansive interpretation of that word) *and* an "occupational disease" (because of the catchall

category added in the 1971 amendment). In fact, both claims are pressed here on appeal.

 Claimant argues that his pulmonary disease is an "accident" as that term is presently defined in I.C. § 72–102(14)(b):

"Accident" means an unexpected, undesigned, and unlooked for mishap, or untoward event, connected with the industry in which it occurs, and which can be reasonably located as to time when and place where it occurred, causing an injury.

As already indicated, claimant's argument finds much support in Idaho law. *And see Lewis v. Department of Law Enforcement*, 79 Idaho 40, 311 P.2d 976 (1957). Moreover, the argument is generally successful in other jurisdictions. *See* 1A Larson § 39.10. Nonetheless, we deem it preferable to continue construing our statute's categories of "accident" and "occupational disease" as mutually exclusive. What was held in *Peterson v. Sunset Minerals*, 75 Idaho 354, 272 P.2d 692 (1954), would still seem to be accurate despite the liberalizing effect of the 1971 amendments:

An occupational disease is not an injury by accident, nor is an injury by accident an occupational disease.

75 Idaho at 359, 272 P.2d at 695. One need no longer prove that an accident happened suddenly, but one is still required to show that it caused an "injury" and the latter term "shall in no case be construed to include an occupational disease." I.C. § 72–102(14)(c). It follows that claimant's pulmonary disability must qualify as an "occupational disease" rather than as an accidental injury if it is to be compensable at all.

We return, therefore, to the statutory requirements set forth in I.C. § 72–102(17)(a) and (b). We have already indicated our response to the causation question of whether Bowman's disability was contracted or incurred while working for (arose

---

2. In the absence of such a statutory catchall, a claimant who could prove that his disabling disease was work related would have to pursue his remedy at tort law. It seems clear that the legislature prefers to have all claims for work-

related disability benefits presented before the Industrial Commission. *McDrummond v. Montgomery Elevator Co.*, 97 Idaho 679, 551 P.2d 966 (1976).

out of and in the course of his work for) Twin Falls Construction Co. We consider, then, the second requirement which deals with the burden a claimant must carry who attempts to prove that his disability results from hazards which "actually exist, are characteristic of, and peculiar to" his employment. In practice, the problem revolves around what is "peculiar" to an employment, since any claimant who has proved causation in his own case will generally have proved that the hazards were actually present in and characteristic of his work.

In the present case, the evidence before the Commission on this question was nearly one-sided. Dr. Cutler of the Rumel Chest Clinic testified as follows:

> By and large from my past experience that most of the people that I see who are pretty much crippled from the standpoint of pulmonary function and do have pulmonary emphysema that the majority of these people have been out working in the open, . . . They have been people who have done many different types of jobs, just kind of *general labor or construction work, mining, this sort of thing where they are in an atmosphere in which there are these other aggravating factors.*

Dr. Smith, for his part, observed that

> It is well documented in literature that people that do smoke and are *exposed to certain organic dust and other contaminating factors,* do have a much greater incidence of emphysema than a person that does smoke who is not exposed to these.

Bowman's own evidence was anecdotal, consisting of references to three fellow workers who had died or otherwise suffered from pulmonary ailments similar to his own.

In addition, another witness referred to recent O.S.H.A. regulations requiring industry safeguards such as protective masks and respirators, watering down of the roadbed and the use of airtight and fully ventilated cabs for the heavy equipment operators. (The evidence is probative not of negligence—which has no place in workmen's compensation cases—but of a recognition that dust is a hazard which is actually present in, characteristic of, and peculiar to this occupation.) Finally, counsel for claimant drew the Commission's attention to a medical treatise which states that workers with severely injured lungs are mostly older workers who did not have the benefit of these new techniques for safeguarding the work environment (D. Hunter, Diseases of Occupation, 4th ed. 1969), and to a host of cases from other jurisdictions holding compensable the pulmonary diseases which result from dust-filled work environments.

The sole contrary testimony was that of Dr. Nowierski, who remarked:

> I think that in all fairness, perhaps it [Bowman's physical disability] could have been slightly aggravated by his occupation, but certainly *we do not, with any impressive degree, find heavy equipment operators routinely developing emphysema.* It's not that common a problem with them.

Dr. Nowierski did not elaborate upon the extent of his opportunities for observations which led him to such conclusions in the heavy equipment industry, nor did he suggest any sources upon which he placed reliance. The Commission concluded that Bowman's "pulmonary disease is not due to the nature of his occupation, nor is it characteristic of and peculiar to his occupation."

It appears to us that the Commission, in reaching its conclusions as to the effect of I.C. § 72–102(17)(a) and (b), may have entertained an overly restrictive notion of how "peculiar" to a given employment the hazards must be. If such was the case the result was the placing of an unreasonable burden upon claimant.

◼ It is clear, for example, that a claimant need not prove that a disease is "peculiar" to his occupation in the sense used by Dr. Nowierski, namely, that it is the general and usual thing among his coworkers. The fallacy of setting the burden that high was clearly perceived by the Connecticut Supreme Court of Errors:

We cannot import into the conception of occupational disease under our law the element that the disease must be a usual or generally recognized incident of the employment. . . .

Occupational diseases result ordinarily in incapacity in a relatively small proportion of the number of employees subjected to the risk; indeed, if this were not so, economic considerations would require an abandonment of the employment or a change in its conditions to obviate the risk.

*LeLenko v. Wilson H. Lee Co.*, 128 Conn. 499, 504, 24 A.2d 253, 256 (1942).

Similarly, one cannot interpret the phrase "peculiar to the occupation," to mean diseases which are not otherwise found among the general public. Such an interpretation, as the Supreme Court of Pennsylvania noted, *Utter v. Asten-Hill Mfg. Co.*, 453 Pa. 401, 309 A.2d 583 (1973), would do violence to the legislative intent. Under such an interpretation, a worker disabled because of lung cancer contracted by exposure to toxic materials in the steel industry would be denied recovery because lung cancer is neither peculiar to the steel industry nor uncommon in the general public. So to construe the catchall clause in the "occupational disease" statute would restrict its application "only to the discovery of new diseases having their genesis in the claimants' occupations" and would effectively remove from the act the legislature's express provision for "situations like this one where the decedent's fatal diseases, though not enumerated elsewhere in the act, are nonetheless generated by an occupational hazard." *Utter v. Asten-Hill Mfg. Co.*, 309 A.2d at 588.

Further, it is now generally recognized that the phrase "peculiar to the occupation," is not intended to be used

in the sense that the disease must be one which originates exclusively from the particular kind of employment in which the employee is engaged.

*Glodenis v. American Brass Co.*, 118 Conn. 29, 40, 170 A. 146, 150 (1934).

Finally, it is also well established that the requirement of "peculiarity" to a given occupation cannot be used to deny compensation simply because the disease would not have occurred aside from the extraordinary susceptibility of the individual worker. *State ex rel. Ohio Bell Telephone Co. v. Krise*, 42 Ohio St.2d 247, 327 N.E.2d 756 (1975).

What, then, should the Commission look for in determining whether a given occupational disease results from hazards "characteristic of and peculiar" to the worker's occupation? We find the best answer is that given by the Supreme Court of Michigan which, in construing "characteristic of and peculiar to" language, held that the requirement means

The term "peculiar to the occupation" is defined in *Glodenis v. American Brass Co.*, 118 Conn. 29, 170 A. 146, 150, and quoted in Mr. Justice Reid's opinion in *Samels v. Goodyear Tire & Rubber Co.*, 317 Mich. 149, 26 N.W.2d 742, 745, as follows: "The phrase, 'peculiar to the occupation,' is not here used in the sense that the disease must be one which originates *exclusively* from the particular kind of employment in which the employee is engaged, but rather in the sense that the conditions of that employment must result in a hazard which distinguishes it in character from the general run of occupations." (Italics in original.)

*Underwood v. National Motor Castings Division, etc.*, 329 Mich. 273, 276, 45 N.W.2d 286–87 (1951).

The order of the Commission finding Bowman totally and permanently disabled is affirmed, and the finding that occupational factors have contributed to his total disability is affirmed. The order insofar as it denied benefits is reversed. On remand the Commission will, in light of our interpretation of I.C. § 72–102(17)(a) and (b), reconsider whether the disease is due to the nature of his employment in which the hazards of his disease actually existed, and whether the disease is characteristic of and peculiar to his employment. If the Commission reaches a conclusion in that respect

which is favorable to claimant, it will make a determination as to the apportionment of claimant's total and permanent disability attributable to the respondents herein and to the state industrial special indemnity fund, which may be brought into the proceeding on motion of either of the present parties.

McFADDEN and DONALDSON, JJ., concur.

BAKES, Justice, concurring specially:

I concur with that portion of Part II of the majority opinion which reverses the decision of the Industrial Commission because the commission imposed an improper standard of proof on the witnesses, i. e., medical certainty rather than medical probability. *Dean v. Dravo Corp.*, 95 Idaho 558, 511 P.2d 1334 (1973). As a result, it is necessary to remand this matter to the commission for a new hearing at which the witnesses are permitted to give their medical opinions based upon the proper standard.

However, I disagree with the balance of the majority opinion as it attempts to parlay the commission's finding that "the inhalation of dust during the claimant's employment aggravated his pulmonary disease to a slight extent, [but] it was not the underlying cause of the disease or a major aggravating factor," and that "occupational factors have contributed only slightly to the claimant's present total disability," into a conclusion that "having found that Bowman's 'working conditions' contributed, even slightly, to a disability which is total and permanent, such permanent and total disability is fully compensable." *Ante* at 773. In arriving at that conclusion, the majority relies heavily upon *Beaver v. Morrison-Knudsen Co.*, 55 Idaho 275, 41 P.2d 605 (1934), affirmed on rehearing, in which this Court overruled factfindings of both the Industrial Commission and the district court and found that:

"As to the *cause* of the injury, it seems clear from the evidence that the inhalation of silica dust while working for the Morrison-Knudsen Company from 1928 to October, 1931, revived a latent tuberculo-

sis condition in the employee's lungs which in 1931 suddenly 'lightened up' or as the physician says, 'blew up, all to pieces at once,' some time between February and October, 1931, and resulted in his death.

"Now this brings us to the practical and crucial inquiry: When did the injury or 'accident,' if such occur?" 55 Idaho at 294, 41 P.2d at 612, on rehearing.

After having found, contrary to the Industrial Accident Board and the court below, that the inhalation of silica dust caused the revival of the tubercular condition, the Court in the *Beaver* case then went on to find an "accident," contrary to the findings of the Industrial Commission and the district court. The majority opinion praises the *Beaver* decision as the "pioneer in awarding relief for workers afflicted by occupational disease." The *Beaver* case did have a salutary effect upon the law of this state in that it prompted the legislature subsequently to enact an occupational disease law to protect workmen who are disabled as a result of diseases arising out of and in the course of the worker's employment. However, the *Beaver* decision also probably pioneered the constitutional amendment to Art. 5, § 9, of the Idaho Constitution which limited the jurisdiction of the Supreme Court "on appeal from orders of the industrial accident board . . . to a review of questions of law." We cannot ignore the language contained in the constitutional amendment of 1935 which prohibits this Court from entering the factfinding process as was done in the *Beaver* case and is being done by the majority in this case. This Court has been too prone to do just that. *Lyons v. Industrial Special Indemnity Fund*, 98 Idaho 403, 565 P.2d 1360 (1977); *Jenkins v. Agri-Lines,* —— Idaho ——, —— P.2d —— (1978), petition for rehearing granted. I would reverse and remand to the commission to hold a new hearing in this matter without concluding, as the majority has done, that the plaintiff's illness is "fully compensable." *Ante* at 773.

There is another reason why all of the issues in this case should be retried by the commission. As correctly pointed out in Part II of the majority opinion, not only did the commission require the medical witnesses to testify to an incorrect standard of medical certainty, rather than medical probability, "the Commission in making its evaluation of the causes of claimant's total and permanent disability was applying the same standard of 'medical certainty' which it required counsel to use in phrasing questions. An ultimate finding based upon an improper application of law to the facts cannot stand." *Ante* at 776. In spite of that correct statement, the majority nevertheless selectively approves "the finding that 'occupational factors have contributed [omitting the words 'only slightly'] to [his] present total disability'" in concluding that claimant's illness is "fully compensable." *Ante* at 774. Since all of the medical testimony must be retaken and reconsidered by the commission on retrial, they should not be bound to findings from the prior hearing which the majority itself has concluded were based upon an improper evidentiary standard.

On remand I would direct that the commission make new findings and conclusions upon all aspects of the case.

SHEPARD, Chief Justice, dissenting.

I dissent from the majority's opinion in this case since, I believe, the Court is substituting its judgment of what is an occupational disease for that of the Board and because, in my opinion, the Court is setting aside findings of fact supported by evidence, albeit controverted, *Gradwohl v. J. R. Simplot Co.*, 96 Idaho 655, 534 P.2d 775 (1975). The scope of our review in cases such as this, which is and should be quite narrow, is established both by the Idaho Constitution, Article 5, section 9, and by statute, I.C. §§ 72–724, 72–732. It is evident that expertise in highly complex compensation cases are not the special province of the judiciary. For that reason, a broad authority was vested in the Board as an agency with expertise. Only when the Board's decisions are unsupported by "*any* substantial competent evidence,"[a] I.C. § 72–732(1), or are not supportable as a matter of law, Idaho Constitution, Article 5, section 9, does this Court have the authority and rightful power to reverse a decision of the Board. I believe neither standard justifies the Court's action today.

The Board concluded that the claimant's pulmonary emphysema was not an occupational disease within the meaning of I.C. § 72–102(17)(a), because it was not "due to the nature of his occupation, nor is it characteristic of and peculiar to his occupation as a heavy equipment operator in road construction work." The above statute defines an occupational disease as one "due to the nature of an employment in which the hazards of such disease actually exist, are characteristic of, and peculiar to the trade, occupation, process, or employment." The majority does not argue that pulmonary emphysema was brought on by claimant's job since the evidence rather strongly suggests it was caused by claimant's long-term heavy smoking. Rather, the majority concludes that pulmonary emphysema becomes an occupational disease when it is aggravated, however slightly, by job related conditions, such as dust which is common in the operation of heavy construction equipment. The requirement that an occupational disease be "characteristic of, and peculiar to" the employment contemplates, I believe, more than the fortuity that a preexisting disease be aggravated in some respect by a job related condition. I find the authorities cited by the majority inapposite because dust is not a hazard peculiar to heavy equipment operators. *Bess v. Coca-Cola Bottling Co.*, 469 S.W.2d 40 (Mo.App.1971). I, therefore, believe the Court errs in substituting its judgment for that of the Board as to whether the claimant's pulmonary disease was an occupational disease within the meaning of I.C. § 72–102(17)(a). Deciding whether or not a condition is an occupational disease is not a matter in which judicial experience and training create special expertise. For that reason such decisions are committed to the Board and today's decision undercuts the authority of the Board.

I would affirm the Board's factual determination that the appellant's disease was not characteristic of and peculiar to his occupation, which finding is supported by the testimony of Dr. Nowierski. By statute we may only set aside an order of the Board if it is not based on "*any* substantial competent evidence." While two other doctors testified in favor of the claimant, our task in reviewing orders of the Board does not allow us to weigh conflicting evidence. We must affirm where "*any*" substantial competent evidence supports the Board's action. Dr. Nowierski's testimony here was substantial and competent and supports the Board's determination. Applying the statutory standard of review set out in I.C. § 72–732(1) to this case requires, in my estimation, an affirmance.